

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NO. AP-76,073

**LARRY RAY SWEARINGEN, Appellant**

**v.**

**THE STATE OF TEXAS**

ON DIRECT APPEAL IN
CAUSE NUMBER 99-11-06435-CR FROM THE 9th DISTRICT COURT
OF MONTGOMERY COUNTY, TEXAS

**HERVEY, J., delivered the opinion for a unanimous Court.**

**O P I N I O N**

Larry Ray Swearingen ("Appellant"), sentenced to death for the capital murder of Melissa

Trotter, appeals an order denying his motion for post-conviction forensic DNA testing. For the

following reasons, we affirm the judgment of the trial court.

The evidence from appellant's 2000 trial shows that, in December 1998, appellant murdered

Melissa Trotter by ligature strangulation with a piece of pantyhose during an aggravated sexual

assault or kidnapping or attempted kidnapping and left her body in a national forest where it was found about three weeks later. *See also Swearingen v. State*, 101 S.W.3d 89, 92-95 (Tex. Crim. App. 2003) (more fully setting out the evidence presented at appellant's 2000 trial). In this third Article 64 proceeding that appellant has filed, the trial court made findings, supported by evidence presented at appellant's 2000 trial and other evidence developed during post-conviction proceedings, that overwhelmingly support appellant's guilt.

Since his 2000 trial, appellant has filed an initial habeas corpus application and numerous successive habeas corpus applications, two of which we found contained claims that could be considered on their merits under Article 11.071, Section 5, TEX. CODE CRIM. PROC. This Court denied habeas corpus relief on the merits of these applications (the initial habeas corpus application and two successive habeas corpus applications) and dismissed appellant's other successive habeas corpus applications as an abuse of the writ. In addition, appellant filed his first Chapter 64 motion for DNA testing in October 2004, which the trial court denied in April 2005. Appellant filed his second Chapter 64 motion for DNA testing in May 2008, which the trial court denied on January 19, 2009.

Appellant filed this third Chapter 64 motion for DNA testing on January 6, 2009, just three weeks before his 2009 execution date. The trial court denied that motion on January 19, 2009. Appellant's third Chapter 64 motion for DNA testing requested DNA testing of materials for which appellant could have, but did not, seek DNA testing in either of his two previous Chapter 64 motions for DNA testing. Appellant's third Chapter 64 motion for DNA testing requested an order authorizing:

> 1. retesting of the blood under the victim's fingernails, using STR or mini-STR testing, to get a more complete STR profile that can be uploaded into CODIS and

compared to STR profiles from other pieces of evidence;

2. the comparison of the existing STR profile from the blood under the victim's fingernail scrapings to the State and Federal DNA databanks–CODIS;

3. testing of any other material from the fingernail scrapings of the left and **right** hands using Y-STR testing that focuses only on male DNA;

4. testing of scrapings from the ripped jeans for contact or touch DNA using STR or mini-STR testing;

5. testing of the ligature for touch DNA using STR testing;

6. testing of the victim's clothing, especially the areas where her clothes were moved, for touch DNA using STR testing;

7. testing of the foreign pubic hair that was recovered during the collection of the rape kit using STR or mitochondrial DNA testing; and

8. comparison of any profiles obtained from the testing requested in 3-6 to the profile in 1 and 2.

(Footnote omitted and emphasis in original).

In his order denying DNA testing, the trial judge concluded that DNA testing was available at the time of trial and that testing of blood flakes found under the victim's fingernails would be improper as it had already been tested and the testing provided accurate and probative results.[1] Additionally, the trial court concluded that testing of the fingernail scrapings of the left and right hands and that testing of the scrapings from the ripped jeans was improper because there had been no showing that these evidentiary items contained biological material.[2] The court also found testing of the ligature and the victim's clothing was improper because there had been no showing that these evidentiary items contained biological material. Additionally, the court found appellant's motion to test the pubic hair improper because the pubic hair could not be found and a chain of custody could not be established. Finally, the court found that appellant's request for DNA testing was improper because the request was made to unreasonably delay the execution of appellant's sentence.

---

[1] The Department of Public Safety (DPS) lab, in prior DNA testing of the blood flakes, was able to obtain a full DNA male profile that did not match that of the appellant.

[2] TEX. CODE CRIM. PROC. art. 64.01(a).

Appellant timely filed a direct appeal on January 23, 2009. In his appeal, he asserts the trial court improperly denied his request for DNA testing and presents the following issues to this Court.

> 1. Whether Appellant is entitled to conduct post-conviction DNA testing on the victim's right and left hand fingernail scrapings, the ligature used to strangle the victim, several discrete areas of the victim's clothing that were touched by the perpetrator, and any hairs still in existence that were recovered from the scene, where such testing (a) satisfies the requirements of Chapter 64 of the Texas Code of Criminal Procedure, *i.e.,* that exculpatory results would create at least a "51% chance" that he would not have been convicted, and (b) has the capacity to conclusively establish Appellant's actual innocence by identifying another convicted offender as the true perpetrator through use of the CODIS DNA database?

> 2. Whether the District Court erred in failing to consider the significant non-DNA evidence refuting the State's evidence at trial and supporting Appellant's innocence in denying his request for DNA testing?

Appellant contends that the exculpatory results of the testing would create at least a 51% chance that he would not have been convicted. He further contends that the testing results have the capacity to conclusively establish appellant's actual innocence by identifying another person as the true perpetrator. The State argues that requests for testing should have been made at trial or in any of appellant's previous two motions for DNA testing and the results of DNA testing already conducted on evidentiary materials have proven to be probative and accurate. The State also argues that appellant has failed to prove that the evidence that he wants submitted for post-conviction DNA testing contains biological material. This court is guided by precedent and Chapter 64 of the Texas Code of Criminal Procedure.[3] As Art. 64.01(b) indicates, different burdens exist, depending on whether evidentiary materials have previously been tested for DNA. When reviewing an appeal from a motion seeking DNA testing, we defer to the "trial court's determination of issues of historical fact and application-of-law-to-fact issues that turn on credibility and demeanor, while we

---

[3] *See Routier v. State*, 273 S.W.3d 241, 245-46 (Tex. Crim. App. 2008).

review de novo other application-of-law-to-fact issues."[4] We begin our analysis with those items that have never before been tested.

## I. APPELLANT'S POST-CONVICTION REQUEST FOR DNA TESTING OF EVIDENTIARY MATERIALS THAT PREVIOUSLY HAVE NOT BEEN TESTED

### *Ripped jeans, ligature, and articles of victim's clothing*

Chapter 64 requires multiple threshold criteria to be met before a convicted person is entitled to DNA testing. One of the primary requirements is a showing of "unavailability" which can be established in only three ways.[5] An Applicant may show DNA testing was not available at the time of trial.[6] If DNA testing was available, an Applicant may show that the DNA-testing technology was not capable of providing accurate and probative results.[7] In the alternative, an Applicant may also seek testing if the interests of justice require it and the failure to test evidence earlier was through no fault of his own.[8] In any of the these scenarios, it must first be established that evidence sought to be tested contains biological material.[9]

Article 64.01(a) reads in part, "A convicted person may submit to the convicting court a motion for forensic DNA testing of evidence *containing* biological material" (emphasis added). A literal reading of the statute unequivocally mandates that all evidence to be tested must first be proven to contain biological material. When interpreting a statute, this court is limited to its plain

---

[4] *Rivera v. State,* 89 S.W.3d 55, 59 (Tex. Crim. App. 2002).

[5] *See Skinner v. State*, 293 S.W.3d 196, 200 (Tex. Crim. App. 2009).

[6] TEX. CODE CRIM. PROC. art. 64.01 (b)(1)(A)(I).

[7] TEX. CODE CRIM. PROC. art. 64.01 (b)(1)(A)(ii).

[8] TEX. CODE CRIM. PROC. art. 64.01 (b)(1)(B).

[9] TEX. CODE CRIM. PROC. art. 64.01 (a).

meaning unless the language is ambiguous or its plain meaning leads to absurd results that the Legislature could not possibly have intended.[10]  Because Chapter 64 does not describe a method for determining the existence of biological material, a plain reading of the statute, as appellant points out, could lead to the deprivation of DNA testing in the rare case simply because of the inability to ascertain whether or not biological material exists.  As an appellate court, we must give effect to the plain meaning of the statute.  It is incumbent upon the Legislature, not this Court, to provide statutory means, if appropriate, for determining whether the defendant meets the burden of showing that evidence contains biological material.  However, this court has held that a mere assertion or a general claim that existence of biological material is probable will fail to satisfy the appellant's burden.[11]  Where an appellant has failed to provide facts in support of his motion, "we cannot say that the convicting court erroneously determined that appellant failed to show existence of evidence containing biological material."[12]

Here, the trial court found that appellant failed to prove that biological material existed on the ripped jeans, the ligature, or any of the articles of clothing.  While testimony presented at trial supports the fact that the perpetrator touched several items sought to be tested, appellant makes only a general claim that biological material could be found from that touching.[13]  In this third motion for

[10] *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[11] *Routier*, 273 S.W.3d at 256  ("At present, however, the appellant has provided no concrete evidence that such an examination was actually done, or if it was, that any biological material that may have been recovered was retained...the appellant fails to meet her threshold burden of showing that there is even any evidence containing biological material to be tested.").

[12] *Dinkins v. State*, 84 S.W.3d 639, 642 (Tex. Crim. App. 2002).

[13] *See* Appellant's January 6, 2009 Motion, at 4-5. In appellant's third motion for post-conviction DNA testing, appellant asserts, "Trotter's upper garments were obviously grabbed with considerable force, more than enough to dislodge skin cells and other biological evidence from the
(continued...)

post-conviction DNA testing, appellant included a letter from the District Attorney's office handling the disappearance of Jon Benet Ramsey, which hints at the success of touch DNA.[14] In his motion, he also refers to several reports in his motion that highlight the success of Short Tandem Repeat ("STR") DNA testing. The mere fact that these DNA technologies exist and that the technology can potentially be successful is not enough to create the right to testing. Appellant fails to show whether STR testing would be probative or if it was even possible. Rather, appellant relies on conclusory statements:

> The concept that individuals deposit their DNA on objects that they touch, particularly objects like a ligature that must be grasped with such a strong force is not a novel concept. No credible DNA analyst could question that conclusion.

We fail to understand why this testing was not previously requested if, in fact, depositing DNA on objects "touched" is not novel. Further, no expert testimony or scientific data was presented to support the conclusion that DNA would necessarily be deposited through grasping with strong force. The trial court concluded there had been no showing that evidentiary items submitted for testing contained biological material.[15] Specifically, the trial court found that appellant failed to show the fingernail scrapings, the ligature, the scrapings from the ripped jeans or the remaining articles of clothing contained biological material. Almost total deference is given to a trial court's

----

[13](...continued)
person who carried her into the woods." Shortly later, appellant claims, "The force needed to strangle someone by ligature also would have abraded testable biological materials from the hands of the attacker."

[14] *See* Appellant's January 6, 2009 Motion, Exhibit H. In the letter, the District Attorney comments on the ability to obtain DNA using the scraping method, "a process in which forensic scientists scrape places where there are no stains or other signs of the possible presence of DNA...."

[15] *See* Order on Third DNA Mtn., findings 29-32, conclusions of law 3-4.

findings concerning whether the claimed DNA evidence exists and is in a condition to be tested.[16]

As the trial judge makes clear in its January 19th order, the record is void of any concrete evidence that biological material existed on the evidence sought to be tested. We agree and accordingly affirm the trial court's ruling in regards to items 4, 5, and 6.

### Left and right-hand scrapings

Swearingen also seeks "testing of any other material from the fingernail scrapings of the left and right hands." Again, we are confronted with ascertaining whether evidentiary materials contain biological material. The trial court expressly concluded "Movant's motion...is improper under Chapter 64 because there has been no showing these evidentiary items do contain biological materials."[17] We agree.

Both right and left-hand scrapings have already been examined by Texas Department of Public Safety ("DPS"). The only material within the right-hand scrapings was "black flaky matter" that did not test positive for human DNA. The left-hand scrapings were examined and criminologists found "some really small, minute trace of what appeared to be like, sand or gravel" and "very tiny, bright red flakes."[18] Again, appellant's "proof" of biological material rests on conclusory statements and general claims.[19] We reiterate today that in order to show evidence

---

[16] *Rivera*, 89 S.W.3d at 59.

[17] Order on Third DNA Mtn., finding 30, conclusion of law 3.

[18] *Id.,* findings 17, 19, 25, 28.

[19] Reply to State's Motion Opposing Petitioner's January 6th Motion for DNA testing, pg. 5 (Movant argues that the failure to detect any human DNA on the victim's right hand "should not, by definition preclude additional testing....[I]t is unlikely that no human DNA is present on the victim's fingernail scrapings. At a minimum we would expect to see the victim's DNA.").

containing biological material, a movant must articulate more than mere assertions.[20]

Assuming *arguendo* that the fingernail scrapings do contain biological materials, movant still fails to meet the criteria in Article 64.01(b). Evidentiary materials not previously subjected to DNA testing can be requested only in three situations.[21] Movant argues that, because technology has improved dramatically since his trial in 2000, he is entitled to new DNA testing. While technology for DNA testing has certainly improved since 2000, that does not equate to a lack of technological capability at the time of trial. The standard is not whether new technology would yield more probative results, but whether then-existing technology was capable of yielding any probative results at all.[22] Because appellant has not met his threshold burden of proving the evidence contains biological material and the record shows DNA technology was capable of yielding probative results in 2000, we uphold the trial court's decision to deny testing of the fingernail scrapings.

***Pubic hair***

Appellant requests testing of a foreign pubic hair recovered during the autopsy. Indeed, pubic hairs were recovered from a vaginal swab on January 4, 1999.[23] The specimen was sent to a crime lab at the Federal Bureau of Investigation ("FBI"), where it was subsequently reported "no hairs were found" on the swab used for the vaginal inspection. Since the pubic hairs were lost, the evidence was never submitted for testing.

---

[20] *Routier*, 273 S.W.3d at 250 (rejecting defendant's speculative claim that a tube sock might have been used to gag her and therefore could contain additional biological material in the form of saliva and deciding that defendant failed to meet her threshold burden of showing any "evidence containing biological material" in the form of saliva to be tested).

[21] T EX. CODE CRIM. PROC. art. 64.01 (a)-(b).

[22] *Routier*, 273 S.W.3d at 249, 251.

[23] *See* Third DNA Mtn. Exhibit A, pages 35-38.

It has been said that when "potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."[24]  In the absence of bad faith, a failure to preserve potentially useful evidence does not violate due process.[25]  Appellant has not alleged, nor has there been any finding by the trial court suggesting bad faith on the part of the State. Through no fault of appellant, the pubic hair was inexplicably lost.  However, while Chapter 64 allows for testing of evidence for reasons that are of a nature that the interests of justice require it, one cannot test what cannot be found.  Before a convicting court may order forensic DNA testing, it must be shown that the evidence "still exists and is in a condition making DNA testing possible."[26]  A chain of custody must also be established. [27] Neither of these conditions can presently be met here.

While appellant does address Article 64.03 with regard to the fingernail scrapings and the victim's clothing, no attempt is made to explain how the lost pubic hair meets the above criteria. The FBI report clearly states that "no hairs were found" in the sample they received from DPS.  And as the State correctly points out in its brief, even if a search were conducted and the pubic hair found, a chain of custody could not be established.  After reviewing the record, our finding is in harmony with the trial court's conclusion: Appellant's motion to "test the foreign pubic hair that was recovered during the collection of the rape kit is improper under Chapter 64 because no hairs were found in that specimen, and appellant does not show that authorities would have any way of

---

[24] *Arizona v. Youngblood,* 488 U.S. 51, 109 S. Ct. 333 (1988).

[25] *Id.*

[26] TEX. CODE CRIM. PROC. art. 64.03(a)(1)(A)(I).

[27] TEX. CODE CRIM. PROC. art. 64.03(a)(1)(A)(ii) (the evidence has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect).

ascertaining that any loose pubic hair found among stored evidence was from that particular forensic specimen."[28]

## II. APPELLANT'S POST-CONVICTION REQUEST FOR DNA TESTING OF EVIDENTIARY MATERIALS PREVIOUSLY TESTED

### *Blood found under the victim's fingernails*

Fingernail scrapings and a fingernail fragment were submitted to the Texas DPS for analysis.[29] Upon a microscopic review, blood flakes were found in the fingernail scrapings collected during the autopsy.[30] An attempt was made to extract DNA from both the blood flakes and the fingernail fragment.[31] Each item was subjected to PCR testing.[32] It was determined that human DNA could not be detected from the nail fragment. Criminologists however, were able to create a full DNA profile based on DNA from blood flakes found in the fingernail scrapings. Both the appellant and the complainant were excluded as being contributors of these flakes.

Appellant seeks to retest blood under the victim's fingernails, using STR or mini-STR

---

[28] Order on Third DNA Mtn., conclusion of law 6.

[29] According to an October 8, 1999, DPS report, left-nail scrapings were submitted to the DPS lab on January 4, 1999. An additional fingernail fragment was also submitted on October 27, 1999.

[30] In a supplemental report, DPS reported that "small red flakes were detected microscopically on the scraping stick used on the victim's left fingernails. The red substance was collected and frozen pending DNA analysis."

[31] A supplemental DPS report dated December 10, 1999, stated, "An attempt was made to extract DNA from the swab of the nail scrapings, two swabs from the suspect's truck, the roots of the six head and pubic hairs, the swab of the nail fragment, and the blood standard from Robbie Lynn Grove."

[32] Polymerase Chain Reaction ("PCR") is a method used to analyze a short sample of DNA by amplifying selected sections allowing for reproduction of the original strand.

testing. Appellant alleges these new DNA testing techniques would lead to a more complete STR profile that can ultimately lead to the exoneration of Swearingen. Where new DNA testing techniques will likely provide a reasonable likelihood of more accurate and probative results, convicted persons may request additional forensic DNA testing.[33] However, on the facts of this case, appellant has not shown a reasonable likelihood that results would be more accurate or probative. DPS criminalist Cassie Carradine testified that she was able to obtain a full DNA profile from the blood found under the fingernail scrapings. Because prior DNA testing has already resulted in a successful male DNA profile being entered into the Combined DNA Index System ("CODIS"), we find additional testing of the left-hand fingernail clippings have no value added and therefore affirm the trial court's ruling on this matter.

Appellant also claims that the trial court erred in failing to determine whether the male DNA profile from the blood flakes has recently been compared to the CODIS DNA database to determine if it matches a convicted offender. We decide that any attempt by appellant in this proceeding to require the trial court to determine whether the unidentified male DNA profile has been resubmitted to CODIS is beyond the scope of Chapter 64. Chapter 64 provides for DNA testing or retesting of evidence containing biological material and not for database entry of already tested evidence containing biological material that is not subject to retesting.

Notwithstanding the foregoing, the record also supports the trial court's finding that appellant filed his third Chapter 64 motion for DNA testing just 21 days before his scheduled execution "to unreasonably delay the execution of sentence." In response, he asserts that he has tried to seek DNA testing since 2004. Appellant's established pattern of filing motions shortly before an execution date

---

[33] TEX. CODE CRIM. PROC. art. 64.01 (b)(2).

however, leaves little doubt that stalling continues to be an effective strategy. He first filed a subsequent writ on January 22, 2007 – two days before his scheduled execution. Appellant's last two subsequent writs were filed on January 23, 2009 – four days before his rescheduled execution. Appellant could have requested DNA testing and retesting of all of the materials involved in this case when he filed his first and second Chapter 64 motions for DNA testing.[34]

Moreover, in light of the overwhelming evidence of appellant's guilt, even if we were to grant appellant's request to test all of the items proffered and those results were exculpatory, appellant cannot show by a preponderance of the evidence, or that there is a 51% chance, that he would not have been convicted.[35] Texas courts have consistently held that a movant does not satisfy his burden under Article 64.03 if the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing.[36]

One judge on this Court has commented regarding the "mountain of inculpatory evidence"

---

[34] *See* TEX. CODE CRIM. PROC art. 64.03 (a)(2)(B) (convicting court may order DNA testing only if it finds, among other things, that the convicted person establishes by a preponderance of the evidence that the request for DNA testing is not made to unreasonably delay the execution of sentence or administration of justice).

[35] *See Skinner v. State,* 293 S.W.3d 196, 200 (Tex. Crim. App. 2009) (Another requirement is the "different outcome" showing, which is satisfied when the "convicted person establishes by a preponderance of the evidence that ... the person would not have been convicted if exculpatory results had been obtained through DNA testing.") (citing TEX. CODE CRIM. PROC. art. 64.03(a)(2)(A)).

[36] *See Prible v. State*, 245 S.W.3d 466 (Tex. Crim. App. 2008)*; Wilson v. State*, 185 S.W.3d 481 (Tex. Crim. App. 2006); *Hood v. State*, 158 S.W.3d 480 (Tex. Crim. App. 2005); *Whitaker v. State*, 160 S.W.3d 5, 9 (Tex. Crim. App. 2004); *Carter v. State*, 134 S.W.3d 484 (Tex. App.–Waco 2004); *Brewer v. State*, 143 S.W.3d 389 (Tex. App.–Beaumont 2004).

against appellant.[37]   A federal district court has also commented on this "mountain of inculpatory

evidence."

> To reiterate, Swearingen was the last person that Ms. Trotter was seen with alive.
> Ms. Trotter had been in Swearingen's truck, where he forcibly removed hair follicles.
> Swearingen's histological evidence does not explain why she was in his house that
> day, why it was later found to be in disarray, and why he falsely claimed that there
> had been a burglary there.  The evidence itself does not explain why papers belonging
> to Ms. Trotter were found near the house of Swearingen's parents and her cigarettes
> were in Swearingen's house.  The new information does not explain why Ms. Trotter
> was found wearing the same clothes as when she disappeared and why she had a note
> given to her by a friend on December 8 in her back pocket.  The new evidence does
> not show why cell phone records traced Swearingen to a location near where Ms.
> Trotter was found.  Histology does not explain why half of a pair of pantyhose
> belonging to Swearingen's wife was found in Swearingen's house and the other half
> around Ms. Trotter's neck.  The new evidence does not explain why the same meal
> Ms. Trotter was last seen eating was found in her stomach.  Swearingen lied about
> his whereabouts, tried to fabricate an alibi, made false police reports, fled from
> police, asked friends to lie on his behalf, told others that the police would be after
> him, and crafted an ultimately inculpatory letter to throw attention away from
> himself. Swearingen told other inmates, "Fuck, yeah, I did it."  Finally, Swearingen's
> experts do not explain where Ms. Trotter was from December 8 until a few days
> before hunters found her body.[38]

> More importantly, the trial court has made supported-by-the-record findings of fact that

again, underscore the substantial evidence of guilt.[39]

- On the evening of December 7, 1998, two of Movant's acquaintances, the Fosters, witnessed a phone conversation in which Movant arranged for a lunch meeting with a girl at a library the following day, and Movant then told the Fosters that the girl was Melissa Trotter, a college student from Willis.

- Three witnesses saw Movant sitting with Melissa in the Montgomery College library between 11:30 a.m. and 1:30 p.m. the following day, December 8, 1998.

- Melissa's Biology teacher saw Melissa leave the Montgomery College library with a male

---

[37]   *Ex parte Swearingen*, 2009 WL 249778, at *9 (Tex. Crim. App. 2009) (Cochran, J., concurring).

[38] *Swearingen v. Thaler*, Slip Op. 2009 WL 4433221, at *23 (S.D. Tex. November 18, 2009).

[39] Order on Third DNA Mtn., finding 39.

shortly after 1:30 p.m. that day.

- Melissa's car remained in the Montgomery College parking lot following her disappearance on December 8, 1998.

- At 2:05 p.m. on December 8, 1998, Movant called Sarah Searle and said that he was at lunch with a friend.

- Sometime around 3:00 p.m. on December 8, 1998, Movant's landlord saw Applicant's truck leaving from behind his home.

- At 3:03 p.m. on December 8, 1998, Movant placed a cell phone call that utilized a cell tower near FM 1097 in Willis, Texas, which would be consistent with Movant driving from his home to the Sam Houston National Forest.

- Movant's wife testified that she found their home in disarray on the evening of December 8, 1998, but none of the Swearingen's property was missing.

- Movant's wife observed Melissa's cigarettes and lighter in Movant's house that evening, and those items were subsequently recovered from Movant's home during the investigation.

- Hair and fiber evidence, as well as other physical evidence, showed that Melissa had been in Movant's car and his home on the day of her disappearance.

- Movant filed a burglary report falsely claiming that he had been out of town and his home was broken into on the day of Melissa's disappearance.

- Between the time of Melissa's disappearance and Movant's arrest, Movant told two acquaintances on two different occasions that he believed police would be after him.

- When the Fosters heard that Melissa Trotter was missing on December 9, 1998, they contacted Movant, who claimed he did not remember the last name of the girl with whom he had met the day before.

- When Mrs. Foster told Movant that she recalled him saying the last name was "Trotter," and that a girl named Melissa Trotter was now missing, the phone went dead.

- Movant led a Sheriff's deputy on a high speed chase.

- Following Movant's arrest, law enforcement authorities observed and photographed red marks on Movant's neck, cheek, and back.

- On December 17, 1998, two neighbors of Movant's mother and stepfather collected numerous pieces of torn paper from along their street, which turned out to be Melissa Trotter's class schedule and some health insurance paper work Melissa's father had given to her.

- Melissa's body was discovered in an area of the Sam Houston National Forest with which Movant would have been familiar from previous time spent there.

- Melissa's body showed signs of significant decomposition when it was discovered in the woods 25 days after her disappearance.

- The ligature found around Melissa's neck matched the remainder of a pair of pantyhose found within Movant's home.

- The Harris Country Chief Medical Examiner testified that during the digestive process, a person's stomach will usually not empty in less than two hours, and any food within the stomach at death will remain there.

- The contents of Melissa's stomach at the autopsy, which included what appeared to be chicken and a french fry-like form of potato, were consistent with the tater tots she had eaten at Montgomery College shortly before leaving with Movant and the Chicken McNuggets she and Movant had apparently purchased at the nearby McDonald's on the day of her disappearance.

- While in jail, Movant attempted to create an exculpatory letter written in Spanish in which he claimed to be someone else who had knowledge of Melissa's murder.

- Within that letter, Movant detailed specifics of the offense that accurately corroborated the physical and medical evidence in the case.

- While in jail awaiting trial, Movant told a cell mate that he had committed the capital murder and his only objective was to escape the death penalty.

Because of the overwhelming evidence of guilt independent of any potentially exculpatory DNA testing and appellant's inability to show a 51% probability that he would not have been convicted, appellant's first issue is overruled.

In his second issue, appellant claims that the trial court "erred in failing to consider the significant non-DNA evidence refuting the State's evidence at trial and supporting Appellant's innocence in denying his request for DNA testing." This claim pertains to evidence that appellant presented at a hearing in support of one of his successive habeas corpus applications-that the victim's body was left in the national forest sometime after appellant's arrest. The convicting court made findings contrary to appellant on this claim, and this Court adopted these findings in denying appellant relief on this claim. We cannot conclude that the trial court would have abused its discretion if it had not reconsidered this evidence in connection with appellant's third request for more DNA testing. Moreover, any error in doing so was harmless in light of the overwhelming evidence of appellant's guilt.

The judgment of the trial court is affirmed.

Hervey, J.

_____

Delivered: February 10, 2010
Publish