

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. AP-76,281

### IVAN ABNER CANTU, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM THE 380TH JUDICIAL DISTRICT COURT
### COLLIN COUNTY

**HOLCOMB, J., delivered the opinion of the unanimous Court.**

The trial court denied Ivan Abner Cantu's motion for forensic DNA testing. We affirm.

On January 23, 2001, a Collin County grand jury returned an indictment charging Cantu with capital murder under Texas Penal Code § 19.03(a)(2) and (a)(7)(A). On October 3, 2001, the State brought Cantu to trial before a petit jury. At the guilt stage of that trial, the State presented thirty-four witnesses and Cantu presented none. The State's witnesses testified in part[1] as follows:

---

[1] For the sake of brevity and clarity, we discuss only the highlights of the witnesses' testimony.

Sometime in 1998 or 1999, James Mosqueda hired his cousin, Cantu, to work in his mortgage banking business in Dallas. Sometime in mid-2000, Mosqueda terminated Cantu's employment.

On October 15, 2000, Cantu, Amy Boettcher (Cantu's girlfriend), and Jeff Boettcher (Amy's brother) moved into an apartment at 4753 Old Bent Tree Lane in Dallas. The apartment was located about one mile from Mosqueda's residence at 18663 Gibbons Street in Dallas.

Sometime in late October 2000, Cantu told Jeff Boettcher that he intended to kill Mosqueda, who was a part-time dealer in illicit drugs, in order to steal his money (around $13,000 in cash) and his drugs (cocaine and marihuana).

On November 3, 2000, at around 11:30 p.m., Cantu left the apartment in question and drove away in his Honda automobile. Just before he left, he told Amy Boettcher that he was "going to go kill" Mosqueda and his live-in fiancé, Amy Kitchen.[2] About an hour later, Cantu returned to the apartment. His face was swollen, and his clothes were bloody. He told Amy Boettcher, "It wasn't pretty." He then instructed her to put his blue jeans into a bag, but, instead, she put them into their kitchen garbage can.

On November 4, 2000, members of the Dallas Fire Department, at the request of Amy Kitchen's mother, forcibly entered the Mosqueda residence. They found both Mosqueda and Kitchen in their bedroom, dead of multiple gunshot wounds. Mosqueda was lying faceup in bed, and Kitchen was lying facedown on the floor beside the bed. There was no indication of a struggle or of forced entry into the residence (other than the firemen's).

---

[2] The evidence suggests that, at the time in question, Cantu was intoxicated due to the ingestion of illicit drugs.

On November 5, 2000, at around 3:00 a.m., Dallas police found Mosqueda's Chevrolet Corvette automobile parked near the front door of Cantu's apartment. Later that day, the Collin County Medical Examiner performed autopsies on the bodies of Mosqueda and Kitchen. In the course of the autopsies, the medical examiner retrieved one bullet from Mosqueda's body and four bullets from Kitchen's body.

On November 7, 2000, Dallas police searched Cantu's apartment pursuant to a warrant. They found, in the master bedroom, a set of keys hidden inside a man's shoe. One of the keys, they later learned, opened an exterior door of the Mosqueda residence. Another of the keys operated Amy Kitchen's Mercedes-Benz automobile. The police also found bloody blue jeans and bloody socks in the kitchen garbage can. Subsequent forensic DNA testing revealed that blood on the blue jeans matched Mosqueda's blood and blood on the socks matched Kitchen's blood.

On November 9, 2000, Dallas police visited Tawny Svihovec, Cantu's former girlfriend, at her apartment in Dallas. Svihovec directed the police to a cabinet in her apartment, where the police found a .380 caliber, semi-automatic pistol. Subsequent fingerprint testing revealed that latent fingerprints on the pistol's magazine matched Cantu's fingerprints, and subsequent ballistics testing revealed that bullets fired from the pistol matched the bullets retrieved from the victims' bodies.

At the conclusion of the guilt stage, the jury found Cantu guilty as charged in the indictment. At the conclusion of the punishment stage, the jury answered the special punishment issues in such a way that the trial court was required to assess Cantu's punishment at death.

On June 30, 2004, we affirmed the trial court's judgment. *Cantu v. State*, No. AP-74,220 (Tex.Crim.App. 2004) (not designated for publication).

On January 18, 2006, we denied habeas corpus relief without a written opinion. *Ex parte*

*Cantu*, No. WR-63,624-01 (Tex.Crim.App. 2006).

On October 1, 2009, Cantu filed a motion for forensic DNA testing and an affidavit in support thereof. *See* Tex. Code Crim. Proc. art. 64.01. In his motion, Cantu requested the testing of "fingernails recovered from the victims' bodies" and "a hair recovered from the floor mat of [Mosqueda's] car." Cantu argued *inter alia* that: (1) testing of the "biological material found under the decedents' fingernails . . . would exculpate" him and (2) testing of the hair "could be critical to proving" that someone other than him drove Mosqueda's Corvette on the night of the murders or the following day. Cantu also argued that the State's principal witness, Amy Boettcher, was a "doper" and not credible, and that certain other evidence[3] at trial "support[ed] the conclusion that [he] was framed by the rival drug dealers truly responsible for James Mosqueda's murder."

On December 4, 2009, the State filed its response to Cantu's motion for forensic DNA testing. In its response, the State argued *inter alia* that, although "[Cantu] wildly speculates that drug dealers may [have] set him up, forensic [DNA] testing cannot prove that, and any results [would have no] chance of exculpating him."

On December 11, 2009, the trial court denied Cantu's motion without a hearing. The trial court stated in its order that Cantu "ha[d] not established entitlement to have the requested evidence submitted to forensic DNA testing."

On direct appeal to this Court, Cantu brings two issues. Under both issues – Cantu does not

---

[3] This "other evidence" consisted of: (1) Texas toll tag records indicating that someone drove Mosqueda's Corvette on November 4, 2000, at 11:15 a.m., a point in time that may have been after Cantu had already left Dallas heading for Arkansas and (2) Southwestern Bell telephone records indicating that someone at Cantu's apartment made a long-distance telephone call on November 4, 2000, at 8:53 p.m., a point in time after Cantu had already left Dallas for Arkansas.

segregate his arguments under one issue or the other – he argues *inter alia* that he has "satisfied the statutory prerequisites for entitlement to forensic DNA testing" and that, therefore, "the convicting court erred in denying such relief." He also argues that he has shown that "it is more likely than not that testing showing another person's DNA under the victims' fingernails and another person's hair in the victims' car would have resulted in at least one juror refusing to find [him] guilty of capital murder." In support of the latter claim, Cantu argues, as he did below, that Amy Boettcher was not a credible witness and that certain evidence at trial supported a conclusion that he was framed for the murders in question. *See* footnote three, *supra*, and accompanying text.

In its response brief, the State argues *inter alia* that the trial court did not err in denying Cantu's motion for forensic DNA testing because: (1) Cantu failed to establish "that either victim's fingernail scrapings actually contain biological material suitable for testing" and (2) the hair found on the floor mat of Mosqueda's Corvette "possesses no evidentiary value to identify a person associated with the murders."

Chapter 64 of the Texas Code of Criminal Procedure "requires multiple threshold criteria to be met before a convicted person is entitled to DNA testing." *Swearingen v. State*, 303 S.W.3d 728, 731 (Tex.Crim.App. 2010). One of those threshold criteria is that the person seeking the DNA testing must first establish that the evidence sought to be tested actually contains biological material. Tex. Code Crim. Proc. art 64.01(a). "[A] mere assertion or a general claim that existence of biological material is probable will fail to satisfy the [movant's] burden." *Swearingen v. State*, 303 S.W.3d at 732. In his motion for forensic DNA testing and in his accompanying affidavit, Cantu assumed without discussion that biological material might be found under the victims' fingernails. Such an assumption failed to meet Cantu's burden of establishing that the victims' fingernail

scrapings actually contained biological material. Thus, the trial court did not err in refusing to order DNA testing of the victims' fingernail scrapings.

Another of the threshold criteria that must be met before a convicted person is entitled to DNA testing is that the person seeking the testing must first establish, by a preponderance of the evidence, that he would not have been convicted if exculpatory results had been obtained through DNA testing. Tex. Code Crim. Proc. art. 64.03(a). Whether the person seeking the testing has met this threshold criterion is a question that we review de novo. *Routier v. State*, 273 S.W.3d 241, 257 (Tex.Crim.App. 2008). In his motion for forensic DNA testing, Cantu argued that testing of the hair found on the floor mat of Mosqueda's Corvette "could be critical to proving" that someone other than he drove that automobile on the night of the murders or the following day. However, even if DNA testing proved that the hair on the Corvette's floor mat came from someone other than Cantu, that fact would not tend to prove that someone other than he drove the Corvette on the night of the murders or the following day, because such DNA testing would not prove how or when the hair came to be on the floor mat. And, even if DNA testing of the hair could prove that someone other than Cantu drove the Corvette on the night of the murders or the following day, that fact would not tend to exculpate Cantu of the crime for which he was convicted; at most, it might suggest that he had an accomplice. *See Prible v. State*, 245 S.W.3d 466, 470 (Tex.Crim.App. 2008) (presence of another person's DNA at crime scene not necessarily exculpatory). Finally, in light of the overwhelming evidence of Cantu's guilt, recounted above, it is not likely that proof that the hair on the Corvette's floor mat came from someone other than Cantu would have caused his jury to harbor

a reasonable doubt as to his guilt.[4]  Thus, the trial court did not err in refusing to order DNA testing of the hair.

We overrule Cantu's two issues and affirm the order of the trial court.

DELIVERED OCTOBER 13, 2010

DO NOT PUBLISH

---

[4]  In *Swearingen v. State*, 303 S.W.3d 728, 736 (Tex.Crim.App. 2010), we noted, "Texas courts have consistently held that a movant [for forensic DNA testing] does not satisfy his burden under Article 64.03 if the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing."