

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00195-CR

_____

RAYMOND EDWARD LUMSDEN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F15-1103-211

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

In 2016, Appellant Raymond Edward Lumsden was convicted of aggravated sexual assault of a child, indecency with a child, and criminal solicitation of a minor, and the trial court sentenced him to three consecutive life sentences.[1] Since then, he has filed numerous motions requesting postconviction forensic DNA testing under Chapter 64 of the Texas Code of Criminal Procedure, all of which have been denied.[2] Lumsden, acting pro se, now appeals from the trial court's denial of his fourth motion for postconviction forensic DNA testing and his request for the appointment of counsel. We will affirm.

## I. BACKGROUND

The underlying facts of this case have been discussed in detail in our prior opinions. *See Lumsden II*, 2021 WL 4319602, at *1–5; *Lumsden I*, 564 S.W.3d at 866–74. Therefore, we borrow the pertinent facts from them, summarizing where appropriate.

---

[1]We affirmed his convictions and sentences on direct appeal. *See generally Lumsden v. State*, 564 S.W.3d 858 (Tex. App.—Fort Worth 2018, pet. ref'd) (*Lumsden I*).

[2]We previously affirmed the trial court's denial of Lumsden's second and third motions for postconviction DNA testing. *See generally Lumsden v. State*, No. 02-21-00012-CR, 2021 WL 4319602 (Tex. App.—Fort Worth, no pet.) (mem. op., not designated for publication) (*Lumsden II*).

2

## A. The Assault

Allison,[3] Lumsden's then-girlfriend's elementary-aged daughter, accused Lumsden of sexually assaulting her. She testified that after her mother started dating Lumsden, they moved in with him and that she had her own room at Lumsden's house. Allison accused Lumsden of sexually assaulting her one night while her mother was upstairs sleeping. She told her mother about the assault the next morning and recounted the allegations to a SANE[4] nurse and a forensic interviewer.

## B. The DNA Evidence

The SANE nurse "swabbed Allison's mouth, vagina, anus, and fingernail area and combed through her hair to collect biological evidence." *Lumsden II*, 2021 WL 4319602, at *2 (quoting *Lumsden I*, 564 S.W.3d at 870). The State's forensic DNA expert was Christina Capt, a forensic DNA analyst with the University of North Texas Center for Human Identification.

> [She] . . . testified that the vaginal swabs that had been taken from Allison were used to develop an unknown Y STR profile. The buccal swabs from Lumsden were used to develop a known Y STR profile. Capt explained that the profile developed for Lumsden was compared to the profile from Allison's vaginal swab, and "at all nine locations where we obtained data for the vaginal swab, there was an exact match with the

---

[3]In our prior opinions, we used pseudonyms to refer to the complainant, her mother, and all minors. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982). We use those same pseudonyms here.

[4]SANE stands for Sexual Assault Nurse Examiner. *Lumsden I*, 564 S.W.3d at 868.

alleles detected in Raymond Lumsden's profile." Capt testified that she was thus not able to exclude Lumsden from being a contributor to the unknown Y STR profile found in Allison's vaginal swabs. Capt further testified that six out of 10,000 people would have the same nine markers that were located in this case and that no other male contributors were detected on any of the items that were tested.

. . . .

Lumsden admitted that he could not explain the DNA evidence.

*Id.* (quoting *Lumsden I*, 564 S.W.3d at 872–74).

After Capt's testing, Lumsden had the vaginal and anal swabs reanalyzed by his own expert, Suzanna Ryan at Ryan Forensic in California. Because Ryan did not testify at trial, her report was not admitted into evidence. But her report was attached as an exhibit to Lumsden's third motion for DNA testing and included findings similar to Capt's:

> No male DNA results were obtained from the amplification of the anal swab sample. In fact, no male DNA at all was detected during the quantitation stage of analysis. The male quantitation system in use at the UNT laboratory is quite sensitive - capable of detecting the DNA from about 3 or 4 cells' worth of DNA, yet no male DNA was detected from this sample.
>
> . . . A low-level, partial, male profile has been detected in the vaginal swab sample. Re-analysis of the data at a lower analytical threshold than used by the UNT laboratory reveals the possible presence of more than one male individual . . . . However, a major male profile is present[,] and this profile is consistent with Mr. Lumsden and with any paternally related male individual.

*Id.* at *3. In her report, Ryan also discussed the possibility of secondary DNA transfers—a theory that is central to Lumsden's argument for additional DNA testing. Regarding such secondary transfers, Ryan opined as follows:

4. The amount of male DNA detected on what has been labeled as the vaginal swab is very low level[,] and there is no way to determine, through DNA testing, whether the DNA was deposited via a direct contact or through an indirect (secondary) transfer. Considering that [Allison] and Mr. Lumsden [had been] residing in the home together for several months[,] there are many ways in which the DNA located in [Allison's] vaginal area could have transferred here.

It is known that DNA can transfer from person to person or from person to object through a direct contact. The amount of DNA that can transfer through direct contact varies from person to person but can range from no detectable DNA all the way up to 160 nanograms (Kamphausen) or 169 ng (Daty *et al.*). It has also been illustrated through various peer-reviewed journal articles (Cale *et al.*, for example) that DNA can transfer secondarily, through an intermediary. This can be from person to person to object or from person to object to person. An example would include the transfer of Person A's DNA to Person B's hands through a hug or handshake (direct transfer). Person A's DNA would then be available for further transfer onto an object that is touched by Person B (a cell phone, a door knob, a weapon) or even onto another location on Person B's body. For example, if Person B touched [his] face, neck, or genital area, it has been shown by Graham and Rutty and by Jones *et al.* among others that DNA can transfer from a person's hands to other areas on [his] bod[y].

Secondary transfer can also occur from person to object to person. An example of this sort of transfer could be if Person A dried [his] hands on a towel, thus transferring [his] DNA to the towel (primary transfer). If Person B then used that same towel to dry [her] hands or body, [she] could inadvertently transfer some of Person A's DNA to [her] body during the drying process.

Secondary transfer of blood, saliva, vaginal secretions, and semen (as well as possibly skin cells) can also occur in the laundering process as described by Noël *et al.* and Kamphausen *et al.* (2015) who both

5

observed transfer of body fluids onto clean clothing items during the laundering process.

Noël *et al.* found in their research that underwear of girls in volunteer family groups consistently demonstrated the presence of DNA from all members of the family, including the father, mother, and siblings. Y-STR testing would make it even more likely to detect [a] male family member's DNA on a female family member's underwear since it ignores the presence of female DNA.

In this case, since the laboratory did not analyze the underwear, it is unknown whether Lumsden's DNA is also present on [Allison's] underwear as "background" DNA from living in the same home as Lumsden and his male child. Any DNA present on [Allison's] underwear could easily transfer to her vaginal area while she was wearing the underwear. The possible low-level presence of more than one male individual at two loci could be further proof of some sort of secondary DNA transfer event.

5. Since a low amount of male DNA was detected in an excess of female DNA, Y-STR testing had to be conducted in this case in order to obtain any usable DNA results. However, Y-STR testing is different than traditional autosomal testing in that even when a full DNA profile is obtained, the lab can't identify one individual to the exclusion of all others.

Due to the paternal inheritance of the Y-chromosome, Mr. Lumsden's son (in fact, all of his paternal male relatives) would have exactly the same Y-STR profile[,] and it would be impossible to differentiate between the two individuals['] DNA based upon Y-STR testing. Considering this fact, it cannot be stated with any certainty that Lumsden's DNA is truly present in the vaginal area of [Allison]. First, only a partial profile has been obtained. If any of the 8 loci where no results were obtained happened to *not* be consistent with Lumsden, he would be 100% excluded as a possible contributor to the DNA profile. In addition, the DNA detected on the vaginal swab could just as easily be from a secondary transfer event involving Lumsden's son's DNA. If the two children shared a bathroom, bedroom, hamper, or other communal items[,] it would be very easy for DNA from Lumsden's son to be picked up on [Allison's] hands or clothing and be further transferred to her vaginal area.

6

The longer a person lives in a particular home, the more of [his] DNA we would expect to find. Touch DNA can last for extended periods of time indoors with one study indicating full "touch" DNA profiles obtained up to 6 weeks after deposition (Raymond *et al.*). This was the longest time period studied, so it is quite likely, and supported by anecdotal evidence, that touch or transfer DNA can remain for even longer time periods.

6. In this case it is impossible to determine how the male DNA arrived on the vaginal area of [Allison] (primary or secondary transfer)[,] and it is impossible to determine exactly whose DNA is actually present due to the partial Y-STR profile and the paternal inheritance demonstrated with Y-STR typing. It should be noted that the probability of randomly selecting an unrelated Caucasian individual who could also be a contributor to the partial profile obtained from the vaginal swab sample is 1 in 2,457 and, if even one of the 8 loci where no results were obtained is found to be inconsistent with Mr. Lumsden's known DNA profile[,] he would be eliminated as a possible contributor to the DNA detected in this sample.

*Id.* at *3–4.

## C. Lumsden's Postconviction Motions

Soon after we affirmed his convictions and sentences, Lumsden filed his first motion for DNA testing, which the trial court denied in April 2019.

The following April, Lumsden filed an application for writ of habeas corpus. In August 2020, the trial court recommended that the application be denied, and the Court of Criminal Appeals denied it without a written order in June 2021.

In November 2020, Lumsden filed his second and third motions for DNA testing in which he sought testing of the victim's underwear that had not been previously tested and retesting of the vaginal swabs. The trial court denied both

7

motions in a single order, and as previously noted, we affirmed this order on appeal. *See id.* at \*13.

Lumsden filed a second application for writ of habeas corpus in April 2022 and a third such application in June 2022. His second application was denied in July 2022, and his third application was dismissed one week later.

In April 2023, Lumsden filed his fourth motion for DNA testing in which he again sought testing of the victim's underwear as well as the untested DNA swabs inside the sexual-assault kit. Without holding an evidentiary hearing, the trial court issued an order, which contained findings of fact and conclusions of law, denying the motion. This appeal followed.

## II. DISCUSSION

In two issues, Lumsden argues that the trial court erred by (1) denying his fourth motion for DNA testing and (2) denying his motion for the appointment of counsel. Lumsden's arguments are meritless.

### A. Standard of Review

When reviewing a trial court's ruling on a motion for DNA testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure, we apply a bifurcated standard of review. *Reed v. State*, 541 S.W.3d 759, 768 (Tex. Crim. App. 2017); *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002). Under this standard, "we give almost total deference to the judge's resolution of historical fact issues supported by the record and application[]-of-law-to-fact issues turning on witness credibility and demeanor,"

8

but "we review de novo all other application-of-law-to-fact questions." *Reed*, 541 S.W.3d at 768–69.

## B. Chapter 64

Under Chapter 64, a convicted person may file "a motion for forensic DNA testing of evidence . . . containing biological material." Tex. Code Crim. Proc. Ann. art. 64.01(a-1). Such a motion requests testing of evidence that was in the State's possession during trial and that either was not previously tested or, although previously tested, can be tested with newer techniques that would provide more "accurate and probative" results. *Id.* art. 64.01(b)(2)(A); *see Holberg v. State*, 425 S.W.3d 282, 284 (Tex. Crim. App. 2014). A convicting court may order testing only if (1) the evidence "still exists and is in a condition making DNA testing possible"; (2) the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect"; and (3) "identity was or is an issue in the case." Tex. Code Crim. Proc. Ann. art. 64.03(a)(1); *Holberg*, 425 S.W.3d at 284. Additionally, to prevail on a Chapter 64 motion, a convicted person must prove by a preponderance of the evidence that he "would not have been convicted if exculpatory results had been obtained through DNA testing" and that "the request for the proposed DNA testing is not made to unreasonably delay the execution of [the convicted person's] sentence." Tex. Code Crim. Proc. Ann. art. 64.03(a)(2); *Holberg*, 425 S.W.3d at 284.

9

## C. Analysis

### 1. The Trial Court Properly Denied Lumsden's Motion for DNA Testing

In his fourth motion for DNA testing, Lumsden sought testing of the victim's underwear that had not been previously tested and "untested DNA swabs inside of the sexual assault kit." The crux of Lumsden's argument for additional testing is that if another male profile were found, this would not only prove that a secondary or tertiary DNA transfer occurred but also would support Lumsden's theory that the presence of his DNA on the vaginal swab could be explained by such an "innocent" secondary or tertiary transfer.[5]

This argument is just a slightly modified version of the one we rejected in our opinion affirming the trial court's denial of Lumsden's second and third motions for DNA testing. There, Lumsden argued "that DNA testing on Allison's underwear w[ould] uncover his and his son's DNA" and that this would show that Lumsden's "DNA on the vaginal swab came from the DNA on the underwear via 'innocent' secondary transfer in the laundry." *Lumsden II*, 2021 WL 4319602, at *10. However, as we explained, even

> assuming that DNA testing on Allison's underwear would reveal that it
> contains Lumsden's DNA, we cannot make the leap, as Lumsden does,

---

[5]As shown below, Lumsden's innocent transfer theory relies on a tertiary transfer (i.e., person to object to object to person), but he has not presented any evidence of studies documenting such transfers. *Lumsden II*, 2021 WL 4319602, at *11.

that the presence of his DNA on the underwear would prove that his DNA on the vaginal swab was there merely because his underwear transferred DNA to Allison's underwear via the laundry and that her underwear in turn transferred his DNA to her vagina. Although Ryan opines in her report that such transfers are possible, she supports her opinion with summaries of studies and articles that deal with finding DNA and sperm only on female underwear that had been washed with underwear from male family members. She does not describe any study in which the female in the prior studies and articles had a vaginal swab taken after wearing the laundered underwear and that the vaginal swab showed the presence of the male family members' DNA. Additionally, Ryan's report mentions that person-to-object-to-person transfers are possible. But for Lumsden's DNA to be transferred to Allison's vagina according to Lumsden's alleged "innocent transfer theory," it would be in the nature of person (Lumsden) to object (his underwear) to object (Allison's underwear via the laundry) to person (Allison's vagina). Neither the articles attached to Lumsden's second motion nor the articles described in Ryan's report describe studies of such attenuated DNA transfers. The trial court was therefore free to believe the evidence presented at trial and to conclude that DNA testing of Allison's underwear would not exonerate Lumsden but would likely reveal the presence of his DNA—not due to an innocent transfer via the laundry but because he put his finger in her underwear when he touched her vagina.

*Id.* at *11. Thus, finding a third DNA profile on Allison's underwear or vaginal swabs would not prove Lumsden's innocent transfer theory, which is premised on the occurrence of a heretofore undocumented tertiary DNA transfer. *See id.* Any possible third-party DNA on the underwear or swabs would not negate the fact that Lumsden's DNA was found on Allison's vagina. Therefore, even if we were to accept Lumsden's premise that the presence of third-party DNA would prove that secondary or tertiary DNA transfers are possible, the requested testing could not rule out the possibility that Lumsden's DNA was found on Allison's vagina because he sexually

11

assaulted her. Accordingly, the requested testing would, at most, "merely muddy the waters"; it would not exculpate Lumsden. *See Eubanks v. State*, 113 S.W.3d 562, 565 (Tex. App.—Dallas 2003, no pet.) ("A trial court does not err in denying post-conviction DNA testing where, at most, exculpatory DNA tests would 'merely muddy the waters.'" (quoting *Kutzner v. State*, 75 S.W.3d 427, 439 (Tex. Crim. App. 2002))).

Further, even if we were to assume that the testing would show the results that Lumsden suggests, he has nevertheless failed to carry his burden under Article 64.03 because the record contains other substantial evidence of guilt. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A); *Swearingen v. State*, 303 S.W.3d 728, 736 (Tex. Crim. App. 2010). As we detailed in our prior opinion, the record reflects that:

- Allison told her mother, [the SANE nurse], and the forensic examiner that Lumsden had touched her privates; Allison did not mention being touched on her privates by any other male.

- During Allison's physical exam, [the SANE nurse] noted "generalized redness" that covered Allison's vaginal area.

- [The SANE nurse] testified that the redness on Allison's vagina was consistent with Allison's statement that Lumsden had put his finger there.

- Lumsden was the only male in his lineage who was present at the house on the night in question; his son was not home.

- And Lumsden could not be excluded as a contributor to the male DNA that was found on the vaginal swab.

*Lumsden II*, 2021 WL 4319602, at *11. Given this evidence and the lack of support for the multitudinous DNA transfers that Lumsden alleges occurred here, Lumsden has

not demonstrated by a preponderance of the evidence that, even if exculpatory results were obtained, there exists a greater than 50 percent likelihood that he would not have been convicted. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A); *Ex parte Gutierrez*, 337 S.W.3d 883, 899 (Tex. Crim. App. 2011) ("[A] convicted person is not entitled to DNA testing unless he first shows that there is 'greater than a 50% chance that he would not have been convicted if DNA testing provided exculpatory results.'" (quoting *Prible v. State*, 245 S.W.3d 466, 467–68 (Tex. Crim. App. 2008))); *see also Swearingen*, 303 S.W.3d at 736 ("Texas courts have consistently held that a movant does not satisfy his burden under Article 64.03 if the record contains other substantial evidence of guilt . . . ."); *Thompson v. State*, 95 S.W.3d 469, 472 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (holding that the movant did not establish that DNA testing would produce exculpatory results when other competent evidence was available to show that he committed the offense). Accordingly, the trial court did not err by denying Lumsden's request for DNA testing.

We overrule Lumsden's first issue.

## 2. The Trial Court Properly Denied Lumsden's Request for Appointed Counsel

In his second issue, Lumsden asserts that the trial court abused its discretion by denying his request for the appointment of counsel during his Chapter 64 proceedings. We disagree.

13

A convicted person does not have an "absolute" right to appointed counsel in connection with a Chapter 64 request for DNA testing. *Gutierrez v. State*, 307 S.W.3d 318, 321 (Tex. Crim. App. 2010). Rather, if a convicted person intends to file a motion for postconviction DNA testing, the trial court is only required to appoint counsel to the applicant if (1) the applicant tells the trial court that he wishes to apply for postconviction DNA testing; (2) the trial court finds "reasonable grounds" for the application to be filed; and (3) the trial court determines that the applicant is indigent. Tex. Code Crim. Proc. Ann. art. 64.01(c). In short, entitlement to court-appointed counsel in this context is conditioned on the trial court's finding, in relevant part, that "reasonable grounds" exist for filing the motion for postconviction DNA testing. *Gutierrez*, 307 S.W.3d at 321.

Here, Lumsden's motion—his fourth request for postconviction DNA testing—asked to test the same evidence as his prior motions and made essentially the same arguments that had previously been rejected by both the trial court and this court. Further, for the reasons set forth above, Lumsden has failed to carry his burden to show by a preponderance of the evidence that he would not have been convicted if the results of the requested DNA testing had been available at trial. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A). Because Lumsden has not shown "reasonable grounds" for the filing of his Chapter 64 motion, the trial court did not err by denying his request for the appointment of counsel. *See* Tex. Code Crim. Proc. Ann. art. 64.01(c); *Gutierrez*, 307 S.W.3d at 321; *Duran v. State*, No. 02-17-00405-CR,

14

2018 WL 3075030, at *3 (Tex. App.—Fort Worth June 21, 2018, pet. ref'd) (mem. op., not designated for publication).

We overrule Lumsden's second issue.

### III. CONCLUSION

Having overruled both of Lumsden's issues, we affirm the trial court's order.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 29, 2024