

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00412-CR

ROGER EUGENE FAIN                                          APPELLANT

V.

THE STATE OF TEXAS                                          STATE

----------

## FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

In three issues, Appellant Roger Eugene Fain appeals the trial court's denial of his post-conviction motion for forensic DNA testing under chapter 64 of the code of criminal procedure. We affirm.

### II. Procedural History

In 2007, a jury convicted Appellant of capital murder, and the trial court sentenced him to life imprisonment.[2] This court affirmed his conviction. *See*

---

[1]*See* Tex. R. App. P. 47.4.

*Fain v. State*, No. 02-08-00002-CR, 2009 WL 2579580 (Tex. App.—Fort Worth Aug. 20, 2009, pet. ref'd) (mem. op., not designated for publication). In April 2010, Appellant filed a pro se application for post-conviction forensic DNA testing pursuant to chapter 64 of the code of criminal procedure. In June, the State filed notice with the trial court setting forth the location of evidence potentially containing biological material. In July 2010, the trial court appointed Appellant DNA counsel. In August 2010, the State filed its reply. In September 2010, the trial court denied Appellant's DNA motion by written order without a hearing.[3] Through appointed counsel, Appellant appeals the trial court's order.[4]

### III. Factual Background

The indictment alleged that Appellant killed Linda Donahew by strangling her with his hand or hands, or with an object unknown to the grand jury, or by stabbing her with a knife, or by a combination of the strangulation and stabbing, while committing or attempting to commit aggravated sexual assault. Our direct appeal opinion set out the following facts:

> Bonnie Bishop shared a house with her sister, [Linda] Donahew. On June 1, 1987, Bishop left work and arrived home at approximately 8:00 p.m. She entered the house to find her sister's nude and blood-covered body lying on the floor in a bedroom closet.

---

[2]The State waived the death penalty before trial.

[3]Appellant filed a motion to recuse Judge Scott Wisch, presiding judge of the 372nd Judicial District Court. Judge W. Salvant presided over the chapter 64 proceedings.

[4]*See* Tex. Code Crim. Proc. Ann. art. 64.05 (West 2006).

The autopsy revealed that Donahew had died from manual strangulation and that a secondary cause of death was a stab wound to her neck. The postmortem examination also revealed several hairs found clinched in her hands, DNA artifacts in her mouth, and three foreign pubic hairs in the genital area.

Approximately fourteen years later, in August 2001, a DNA sample was taken from Appellant, who was incarcerated for an unrelated crime. The sample was entered into the Combined DNA Index System (CODIS) of the Texas Department of Public Safety (DPS). Four years later, in October 2005, the cold case of Donahew's murder was reopened, and the DNA samples acquired during the examination of her body were uploaded into CODIS and were found to match the DNA profile of Appellant.

. . . .

Dr. Nizam Peerwani, the medical examiner who performed the autopsy and forensic examination of Donahew's body, testified that he took oral swabs from her mouth and that they contained DNA material. He testified that he was unable to determine exactly when the DNA had been deposited in her mouth. Kelly Solis testified that she was a DNA analyst for the DPS CODIS lab in Austin, Texas. She testified that the DNA samples from the oral swabs taken by Dr. Peerwani matched Appellant's DNA profile.

Constance Patton testified that she was a senior forensic biologist and DNA technical leader for the medical examiner's office crime laboratory in Fort Worth. She testified that she had examined the samples from the oral swabs taken by Dr. Peerwani and that the results of her examination showed that the samples contained DNA material consistent with the DNA of Donahew and a mixture containing one DNA sample consistent with that of Appellant and a sample of male DNA foreign to both Donahew and Appellant. Patton testified that it could not be determined whether Appellant's DNA had been contributed before or after the other male DNA or how long it had been present. She also testified that she had tested a portion of a towel taken from Donahew's house. The towel tested presumptively for blood and also for a mixture of DNA from Donahew. She testified that a sample of male DNA from Ronald Nix, a boyfriend of Donahew, could not be excluded from matching the sample on the towel. Patton also found a sperm stain on the comforter from Donahew's bed, the DNA profile of which also matched Nix's sample.

Dr. Peerwani had found several hairs clutched in Donahew's hand during the postmortem examination. One of the hairs was identified as dog hair. Other hairs were consistent with either the hair of Donahew or that of her sister, Bishop. One hair, however, was not matched to Donahew, Bishop, or Appellant.

Susan Kenney testified that in 1987 she had been working as a serologist in the Fort Worth Police Department Crime Lab. She examined the evidence taken by Dr. Peerwani as part of the examination of Donahue's body. She testified that part of the protocol of the examination was to comb the pubic hair area of Donahew. In this case, the combing resulted in finding three hairs that were not similar to those of Donahew.

Detective Jim Ford testified that he had requested DNA testing of the unknown pubic hair found on Donahew's body. The test showed that Nix could not be eliminated as a contributor of the hair.

. . . .

Ernest Fain, Appellant's brother, testified that in 1987, Appellant drove a mid-1970s white Ford pickup truck and that the truck had a black tool box and PVC piping attached to its bed. . . . .

Sheila Nelson testified that she lived next door to Donahew in 1987. On the day of Donahew's murder, Nelson and her husband left the house at approximately 5:15 p.m. to take a walk. They noticed a white Ford pickup truck parked on the street "not in front of my house and not in front of Linda's but kind of between the two." She testified that it was an older model truck with a tool box. The truck was still there when she returned from her walk about fifteen to twenty minutes later. She and her husband went out to eat, and when they returned at about 8:30 p.m., the pickup was gone. Nelson testified that Donahew had had a lot of friends and quite a bit of company.

. . . .

Michael Higham testified that in the late spring and summer of 1987, he was the detail shop manager of Pleasant Ridge Car Wash in Arlington. In the late spring or early summer of 1987, Donahew took her car in for detailing. When he had finished with the car, he went to the horse stables to pick her up and take her back to her car. She was with a man whom he identified as Appellant. Higham drove both the man and Donahew back to pick up her car.

4

. . . .

Danny Smith, a sixty-three-year-old inmate who at the time of trial was serving forty-five years' confinement for involuntary manslaughter, enhanced to a habitual offense, testified that he knew Appellant from having been in prison with him. In 2005, while they were housed in the same cell block of the Eastham Unit, Appellant told him that Arlington detectives had visited him and had taken mouth swabs for DNA purposes. After the visit, Appellant started "acting in an excited type of manner." Appellant told Smith that he had been having sex with Donahew and had unintentionally strangled her during sex. Smith claimed that Appellant told him that the strangulation was part of the sex act.

. . . .

Ronald Nix testified that he had dated Donahew from February 1987 until her death. In May 1987, he and Donahew had taken a vacation together to Mexico. . . . He also testified that he had seen Donahew on the Friday preceding her death. He testified that shortly before her death, he had been at a club with Donahew and had seen her talking with a man whom Nix identified as Appellant. Nix testified that Donahew had given Appellant her phone number. . . .

*Fain*, 2009 WL 2579580, at *1–4.

## IV. ANALYSIS

In three issues, Appellant asserts that the trial court erred by (1) not granting his DNA application, (2) not conducting a live hearing before denying his application, and (3) failing to make proper findings.

### A. Chapter 64 Hearing

In his second issue, Appellant asserts that the trial court erred by not conducting a hearing before denying his request for forensic DNA testing. Appellant acknowledges that the court of criminal appeals and this court have ruled that a trial court is not required to conduct a hearing to resolve whether a

5

defendant is entitled to DNA testing under article 64.03.[5]  *See Ex parte Gutierrez*, 337 S.W.3d 883, 893 (Tex. Crim. App. 2011) ("Article 64.03 does not require any evidentiary hearing before the trial judge decides whether a convicted person is entitled to DNA testing."); *see also Whitaker v. State*, 160 S.W.3d 5, 8 (Tex. Crim. App.), *cert. denied*, 543 U.S. 864 (2004); *Jones v. State*, 161 S.W.3d 685, 689 (Tex. App.—Fort Worth 2005, pet. ref'd).  He contends, however, that a hearing should be required in most article 64 proceedings and especially in this case.

Appellant filed his DNA application and a request for counsel on April 15, 2010.  DNA counsel was appointed on July 20, 2010.  On August 17, 2010, the State filed its reply.  On September 1, 2010, the trial court issued its order denying DNA testing.  Based on these facts, Appellant asserts,

> Article 64.01(c) requires a trial court to appoint counsel whenever a convicted person has requested DNA testing under Article 64.  Tex. Code Crim. Proc. Ann. Art. 64.01(c). . . .

> In the event that a trial judge chooses to rule on a pro se motion without a hearing, the trial judge should, at the least, notify appointed counsel of the court's intention and allow a reasonable amount of time for appointed counsel to respond to the State's argument.  That didn't happen in the instant case.  In this case, the trial court's denial of a hearing is the equivalent of denying Defendant his right to counsel.  This case presents the perfect scenario for requiring a hearing before ruling on a[n] Article 64 application.  In this case, the sum of the State's responses totally disregarded the applicant's main and only request in his application.

---

[5]As the State notes, the legislature has provided for a hearing under article 64.04 after a convicted person has obtained DNA testing under article 64.03, and it could have similarly required the trial court to hold a hearing on whether the convicted person is entitled to DNA testing.

6

Under the instant circumstances, we hold that the trial court did not err in ruling on Appellant's motion before contacting Appellant's DNA counsel and without conducting a live hearing. As originally enacted in 2001, article 64.01(c) stated that a convicted person was entitled to the appointment of counsel merely upon requesting counsel and establishing indigence. *See* Act of April 5, 2001, 77th Leg., R.S., ch. 2, § 2, 2001 Tex. Gen. Laws 2, 2–3 (amended 2003 and 2007). In 2003, however, the legislature amended article 64.01(c) to provide that the convicting court "shall appoint counsel for the convicted person if the person informs the court that the person wishes to submit a motion under this chapter, *the court finds reasonable grounds for a motion to be filed*, and the court determines that the person is indigent." *See* Act of May 9, 2003, 78th Leg., R.S., ch. 13, § 1, 2003 Tex. Gen. Laws 16, 16–17 (amended 2007)[6] (current version at Tex. Code Crim. Proc. Ann. art. 64.01(c)) (emphasis added); *Ex parte Gutierrez*, 337 S.W.3d at 889 (noting that an indigent convicted person intending to file a post-conviction DNA motion now has a limited right to appointed counsel). This language has remained in effect since 2003, and thus, Appellant was not automatically entitled to counsel when he requested it in April 2010.

In addition to requesting counsel in April 2010, Appellant simultaneously filed a detailed, twelve-page application for DNA testing (rather than simply

---

[6]In 2007, the legislature amended article 64.01(c) to simply add that counsel must be appointed "not later than the 45th day after the date the court finds reasonable grounds or the date the court determines that the person is indigent, whichever is later." *See* Act of June 15, 2007, 80th Leg., R.S., ch. 1006, § 2, 2007 Tex. Gen. Laws 3523, 3523–24 (current version at Tex. Code Crim. Proc. Ann. art. 64.01(c) (West Supp. 2011)).

7

expressing his wish to submit a DNA motion). *See* Tex. Code Crim. Proc. Ann. art. 64.01(c) (providing that defendant must inform trial court that he "wishes" to submit motion for DNA testing); *see also Gutierrez v. State*, 307 S.W.3d 318, 323 (Tex. Crim. App. 2010) ("[A] motion for appointed counsel is a preliminary matter that precedes the initiation of Chapter 64 proceedings."). While the record demonstrates that the Office of Attorney Appointments notified Appellant's DNA counsel of his appointment, the record does not contain a finding by the trial court that it found "reasonable grounds for a motion to be filed." *See* Tex. Code Crim. Proc. Ann. art. 64.01(c).

Once appointed, Appellant's DNA counsel chose not to seek a delay or announce an intent to file a new or amended testing motion in the intervening weeks between his appointment and the issuance of the DNA order; in fact, DNA counsel's motion for new trial/reconsideration stated that "Defendant's application for DNA testing is very thorough, very well written, cites the record, and raises some very important issues."[7] In light of these circumstances, we cannot fault the trial court for ruling on Appellant's five-month-old DNA motion.[8] *See generally In re Beasley,* 107 S.W.3d 696, 698 (Tex. App.—Austin 2003, no pet.).

---

[7]DNA counsel also requested the opportunity to be heard and to point out the important issues presented in Appellant's pro se application for DNA testing.

[8]Because the record does not indicate whether it was Judge Salvant or Judge Wisch who set the appointment of counsel into motion, it is not clear that Judge Salvant knew about the appointment of counsel when he signed the order denying DNA testing.

8

*Beasley* is instructive (albeit distinguishable in certain aspects). Beasley filed a pro se motion for DNA testing (under the prior version of the statute when the right to counsel was absolute). *Id.* at 697. Although Beasley did not ask for counsel, the trial court appointed counsel on February 20, 2002. *Id.* On July 5, 2002, the trial court denied Beasley's DNA motion without input from appointed counsel. *Id.* Later, Beasley's counsel filed an "appearance of counsel" objecting to the State's proposed order and requesting additional time to investigate. *Id.* On appeal, Beasley asserted that the district court denied his constitutional rights to counsel and to effective assistance of counsel by ruling on the pro se motion for testing while knowing that he was represented by an attorney who had not filed a further motion for testing. *Id.* In overruling Beasley's points of error, the Austin court of appeals held,

> Clearly, the statute contemplates the appointment of counsel *before* a testing motion is filed. Whether an attorney so appointed would be entitled to an unlimited amount of time to prepare a testing motion, as Beasley asserts, is a question we need not decide because Beasley did not seek appointed counsel but instead filed his own pro se motion. Although the court thereafter appointed counsel, Beasley's motion for testing had been filed and the court was obligated to act on it. [Fn 3: We express no opinion as to whether the statute required the court to appoint counsel under these circumstances.] We are unpersuaded that due process required the district court to ignore Beasley's pro se motion and wait indefinitely for counsel to file a superseding motion.

*Id.* at 698.

Appellant asserts that if the trial court had provided his DNA counsel the opportunity to be heard before ruling on the DNA motion, counsel could have raised the "important point" that "the sum of the State's responses totally

9

disregarded [his] main and only request in his application." As noted above, however, his DNA counsel filed a motion for new trial/reconsideration within several days of the trial court's ruling and raised this same argument (and many of the same issues Appellant raises here), including that the State's arguments and the trial court's order failed to address Appellant's request to test several items that were previously not tested. The denial of counsel's reconsideration motion, however, indicates that a hearing and the presence of Appellant's DNA counsel would not have altered the trial court's ruling. Moreover, because we have conducted our own de novo review of the trial court's order denying testing, we hold that Appellant has not been harmed. *Cf. Jones*, 161 S.W.3d at 689 (holding harmless trial court's failure to hold an article 64.04 hearing because issues raised by defendant would not have shown DNA test results to be anything other than not favorable, as entered by the trial court). We overrule Appellant's second issue.

## B. Denial of DNA Motion

In his first issue, Appellant asserts that the trial court erred by denying his request for the DNA testing of (1) a pair of panty hose; (2) six head hairs clenched in Donahew's hands; (3) loose pubic hairs combed from Donahew's pubic hair that appeared dissimilar to Donahew's; (4) blood transfer on the hot water knob of a bathroom faucet; (5) Donahew's fingernail cuttings; (6) male

10

DNA discovered on the bra and shirt Donahew wore on the day of her death, and a hair on the shirt; (7) a knife; and (8) the oral swabs from the sexual assault kit.[9]

## 1. Chapter 64

To be entitled to post-conviction DNA testing, a convicted person must meet the requirements of articles 64.01 and 64.03. Since its enactment, chapter 64 has undergone several amendments, most recently in 2011.[10] The 2011 amendments do not apply in this case, however, because the effective date of the amendments is September 1, 2011, and Appellant filed his DNA motion in April 2010. Thus, we apply the statute as it existed at the time Appellant filed his motion.

As it existed in April 2010, article 64.01(b)(1) provided that a person could request the convicting court to permit forensic DNA testing of previously untested evidence containing biological material that was in the State's possession during trial of the offense if he could show that the evidence was not previously subjected to DNA testing: (A) because DNA testing was (i) not available; or (ii)

---

[9]Although in his DNA motion, Appellant globally requested the testing of "all available items gathered at the residence of Linda Donahew, and any other place deemed a possible crime area," this type of request does not satisfy the dictates of article 64. *See generally Dinkins v. State*, 84 S.W.3d 639, 642 (Tex. Crim. App. 2002) (convicted person must do more than merely assert chapter 64's requirements have been met). Thus, we address only those items specifically discussed by Appellant.

[10]That year, the legislature amended subsections (a) and (b) and added subsection (a-1) to article 64.01; these amendments apply to motions filed on or after September 1, 2011. *See* Act of June 17, 2011, 82nd Leg., R.S., ch. 278 (H.B. 1573), § 5, 2011 Tex. Gen. Laws 882, 884; Act of June 17, 2011, 82nd Leg., R.S., ch. 366 (S.B. 122), § 1, 2011 Tex. Gen. Laws 1015, 1015–16.

available, but not technologically capable of providing probative results; or (B) through no fault of the convicted person, for reasons that are of a nature such that the interests of justice require DNA testing. *See* Act of April 5, 2001, 77th Leg., R.S., ch. 2, § 2, 2001 Tex. Gen. Laws 2, 2-3 (amended 2011) (current version at Tex. Code Crim. Proc. Ann. art. 64.01(b)(1) (West Supp. 2011)).[11] The convicted person could also seek to re-test biological evidence previously subjected to DNA testing if he could establish that it could be "subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." *See id.* art. 64.01(b)(2) (West Supp. 2011). If one or more of the items that an appellant wished to subject to post-conviction DNA testing met any of these criteria, the trial court could order testing—but only if the appellant also satisfied other statutory predicates, including a showing under article 64.03(a)(2)(A) that he would not have been convicted if exculpatory results had been obtained from DNA testing of as many of the items as meet the article 64.01(b) criteria. *See Routier v. State*, 273 S.W.3d 241, 246 (Tex. Crim. App. 2008) (citing T*ex.* Code Crim. Proc. Ann. art. 64.03(a)(2)(A)).

---

[11]The version of article 64.01(b)(1) that applies in this case was enacted in 2001. Although the legislature amended article 64.01(c) and other articles in chapter 64 in 2003 and 2007, it did not amend article 64.01(b)(1) until 2011.

The current version does not require the convicted person to show why the evidence he wants tested was not previously tested; instead, he must simply show that the evidence "was not previously subjected to DNA testing." *See* Tex. Code Crim. Proc. Ann. art. 64.01(b)(1) (West Supp. 2011).

The person requesting DNA testing bears the burden of satisfying the chapter 64 requirements. *Wilson v. State*, 185 S.W.3d 481, 484 (Tex. Crim. App. 2006). Because the trial court did not conduct a live hearing, we review the trial court's denial of DNA testing de novo.[12] *See Smith v. State*, 165 S.W.3d 361, 363 (Tex Crim. App. 2005) (holding that because trial court did not hold a hearing on a request for DNA testing, reviewing court would review the issues de novo as trial court was in no better position); *Sheckells v. State*, No. 05-09-00747-CR, 2011 WL 1367087, at *2 (Tex. App.—Dallas Apr. 12, 2011, pet. ref'd) (not designated for publication).[13]

Appellant asserts generally that "all of the necessary elements under Art. 64 are met." He explains that "during [his] jury trial, and today, 'identity' has been and is an 'issue' as required by Art. 64"; that "according to the State's art. 64 inventory, all of the evidence that was never tested is still available today, and has been subjected to the proper chain of custody;" and that "if DNA testing of the material [A]ppellant is requesting to be tested are in fact exculpatory, there is

---

[12]In reviewing the trial court's chapter 64 rulings, this court usually gives "almost total deference" to the trial court's findings of historical fact and application-of-law-to-fact issues that turn on witness credibility and demeanor and considers de novo all other application-of-law-to-fact questions. *Ex parte Gutierrez*, 337 S.W.3d at 890; *see Routier*, 273 S.W.3d at 246.

[13]We have reviewed and take judicial notice of the appellate record in our possession. *See* Tex. R. Evid. 201(f); *Routier*, 273 S.W.3d at 244 n.2. Both parties referred to the reporter's record in their DNA pleadings, although it is not clear to what extent, if any, the trial court considered the reporter's record.

13

a greater than 50% chance that he would not have been convicted if those DNA testing results had been available to the jury at his trial."[14]

The State responds that evidence from this murder has already been subjected to forensic DNA testing and inculpated Appellant and that there is no reasonable probability that further DNA testing would prove his innocence given the prior testing. The State argues that "STR DNA testing has shown that the appellant cannot be excluded as the contributor of the semen found in the victim's mouth. It is unlikely that newer testing of this evidence or any other evidence would provide results which would exonerate him."[15]

## 2. The No Fault Provision

Before addressing the specific pieces of evidence Appellant wants tested, we address one of the threshold requirements that impact some of his requests. *See Routier*, 273 S.W.3d at 246. Several pieces of evidence that Appellant wants tested have not previously been tested. Thus, to be entitled to testing, Appellant must show that the evidence was not tested: (A) because DNA testing was (i) not available; or (ii) available, but not technologically capable of providing probative results; or (B) through no fault of his own, for reasons that are of a

---

[14]Appointed appellate counsel refers several times to Appellant's DNA motion, which sets out more specifically his reasons for requesting testing. Thus, we look primarily to the DNA motion for Appellant's arguments.

[15]Except for the oral swabs, the State does not discuss (in either its DNA response or its appellate briefing) the evidence Appellant requested be tested, stating instead in a footnote: "The State recognizes that the appellant is seeking to test other evidence besides the oral swab. The State would simply note that the oral swab is the most probative evidence of who killed Linda Donahew."

nature such that the interests of justice require DNA testing. *See* Act of April 5, 2001, 77th Leg., R.S., ch. 2, § 2, 2001 Tex. Gen. Laws 2, 2–3 (amended 2011). The court of criminal appeals has held that the person seeking DNA testing must make a particularized showing of the absence of fault under article 64.01(b)(1)(B) because chapter 64 requires "defendants to avail themselves of whatever DNA technology may be available at the time of trial." *Ex parte Gutierrez*, 337 S.W.3d at 895.

In his DNA motion, Appellant asserted generally that he can invoke the article 64.01(b)(1)(B) "no fault" provision because he filed a pro se pretrial Motion to Inspect, Examine, and Test Physical Evidence.[16] The motion asked that the State (and any agencies designated by the State) be ordered to "produce certain items of physical evidence in its [or any other State or law enforcement agencies'] possession, and control for inspection and testing by the Defendant and Experts designated by the Defendant," including,

> 1) All clothing taken as evidence from the Defendant, the victim, and any other person connected to this case;

> 2) All fingerprints taken as part of the investigation of this case;

> 3) All blood samples, bodily fluids, tissues or hair samples taken from the scene of the alleged offense or from the Defendant's person, home or vehicle, or from any complainant or witness;

---

[16]In his briefing, Appellant's appellate counsel does not address this issue. Instead, he merely states that "all of the evidence that was never tested is still available today, and has been subjected to the proper chain of custody."

15

4) All physical evidence, including photographs, video tapes, composite drawings, relied upon to refresh or used to assist a State witness, or expert to testify at trial;

5) All evidence, photographs, plats, and diagrams of the scene where the body of the victim was discovered;

6) All written reports, Agency Response Report, Incident Report, Witnesses Statements, Medical Examiner's Autopsy Report, [and other reports]; [and]

7) All physical evidence the State, with Associated Agencies may introduce into evidence at the trial of this case.

Appellant asserts on appeal that he satisfies the "no fault" provision because he filed this motion, the trial court never ruled on it, and his appointed trial counsel failed to file a similar motion requesting DNA testing.

Appellant's pretrial motion does not constitute an attempt to avail himself of the available DNA technology. First, his motion globally requested "testing" and appears to have been filed more in the spirit of a discovery motion than a specific request for DNA testing. Indeed, the motion was filed less than a month after Appellant was indicted, presumably before Appellant would have known what evidence existed, what evidence had been tested, and what results had been obtained.[17] The motion did not specifically request DNA testing of the items he now wants tested. Because Appellant's motion does not show an absence of fault in obtaining DNA testing, the trial court's alleged failure to rule on this motion cannot be said to have thwarted Appellant's efforts to obtain DNA testing.

---

[17]As Appellant notes in his DNA motion, his trial commenced nineteen months after he filed this motion.

Notably, the same day Appellant filed this pretrial "testing" motion, he also filed a motion requesting appointment of legal counsel. The trial court appointed Appellant counsel the next day and subsequently appointed a second attorney (presumably because the State was initially seeking the death penalty). In discussing the "no fault" provision, the court of criminal appeals has stated that "[i]f trial counsel declines to seek testing as a matter of reasonable trial strategy, then post-trial testing is not usually required in the interest of justice." *Ex parte Gutierrez*, 337 S.W.3d at 895. The court has also stated that

> evidence that counsel provided constitutionally ineffective assistance in failing to seek DNA testing of certain items could be sufficient to show that the failure to test was not appellant's fault "for reasons that are of a nature such that the interests of justice require DNA testing." The reasoning behind permitting challenges to the effectiveness of a trial attorney's representation is that "[a]n accused is entitled to be assisted by an attorney . . . who plays the role necessary to ensure that the trial is fair."

*Skinner v. State*, 293 S.W.3d 196, 202 (Tex. Crim. App. 2009) (citation omitted). In light of the court of criminal appeals's instruction, we will analyze trial counsels' effectiveness regarding the DNA evidence at the time of trial.

Appellant's trial counsel filed motions requesting the prosecution to file a list of physical evidence and to provide "copies of any medical or scientific reports, testings, examinations, comparisons, analysis, and/or experiments received or made dealing with any person or physical evidence associated with this case." Before trial, defense counsel hired and designated Dr. Laura Gahn as their "DNA/Forensic evidence expert." The record indicates that the State provided defense counsel the underlying documentation regarding the testing.

17

The record demonstrates that Appellant's trial counsel were aware of untested evidence, and there is no indication that they requested, but were denied, the opportunity to test these items. Although the record does not contain an explicit explanation from trial counsel as to why they did not ask to test untested evidence, counsels' strategy appears clear: counsel used the untested evidence to Appellant's advantage throughout trial as demonstrated below. No showing of ineffective assistance is apparent here. *See Ex parte Gutierrez*, 337 S.W.3d at 896. Nonetheless, we will assess counsels' effectiveness in declining to seek testing for each item that could have been but has not previously been tested, as set out below. Because the record demonstrates that in each instance in which this analysis applies, it was a reasonable trial strategy not to request testing, Appellant cannot demonstrate that the interests of justice require DNA testing.

### 3. Evidentiary Materials Not Previously Tested

In conducting our de novo review, we begin by considering if the items Appellant asked to be tested would qualify for post-conviction DNA testing. *See Routier*, 273 S.W.3d at 245 ("Before addressing the question of whether it is more probable than not that the appellant would not have been convicted had the results of the testing she now seeks been exculpatory, we deem it appropriate first to determine which of the nine items would qualify for post-conviction DNA testing[.]"); *see also Faison* v. *State*, No. 05-08-01311-CR, 2010 WL 851406, at *1 (Tex. App.—Dallas Mar. 12, 2010, pet. ref'd) (not designated for publication). "Only those items that qualify for testing under [article 64.01(b)(1)'s] threshold

18

criteria should be included in the collective calculus for determining whether the appellant would not have been convicted." *Routier*, 273 S.W.3d at 245.

### a. Panty Hose

Appellant asserts on appeal that "[a]mong the more important items that law enforcement witnesses concede were never tested is . . . panty hose found at the crime scene that could have possibly been used to strangle the victim . . . ."[18] The State questioned Dr. Peerwani about a pair of panty hose on Donahew's bedroom floor in front of her dresser (as depicted in a crime scene photograph), as follows:

> Q. [State]: Based upon your autopsy findings, did you have an opinion as to what was used to strangle Linda Donahew?
>
> A. [Peerwani]: I would give a predicted value that more than likely it was done with bare hands, a manual strangulation. And this is, in fact, how I listed that in the findings. However, it's quite possible that other soft objects could have been used, clothing items that may not have left any marks on the anterior neck.
>
> Q. Such as panty hose?
>
> A. Certainly within the realm of possibilities.

Crime scene investigator Officer Brozgold testified he did not collect the panty hose on Donahew's bedroom floor but would have done so if he had seen something suspicious about them. Our review of the record indicates that the panty hose were not collected from the scene. A convicted person may request forensic DNA testing only of evidence that was "secured in relation to the offense

---

[18]Notably, Appellant did not specifically request testing of the panty hose in his DNA motion filed in the trial court.

19

that is the basis of the challenged conviction and was in the possession of the state during the trial of the offense." Tex. Code Crim. Proc. Ann. art. 64.01(b). Because this requirement is not met here, Appellant has failed to establish that he is entitled to conduct DNA tests of the panty hose. Thus, we do not reach the "no fault" provision or whether Appellant would not have been convicted if exculpatory results had been obtained through DNA testing.

### b. Knife

The record indicates that one "wooden handled kitchen knife" was collected from the crime scene. The record further indicates that the State did not introduce a knife into evidence, but instead relied on Dr. Peerwani's testimony describing Donahew's neck wound as "a very large gaping defect" that had a "sharp angulated area . . . and a blunted area consistent with a stab produced by a knife, a blade, a single sharp edge." In his DNA motion, Appellant noted that, not long after Donahew's death, lead investigator Detective Ford tendered a knife to Dr. Peerwani to determine whether it was used to inflict the stab wound to Donahew's neck. Appellant attached to his DNA motion Dr. Peerwani's letter to Detective Ford stating that he had compared "the knife" with Donahew's wound and that "this is a possible weapon."[19]

Appellant asserts, and the record indicates, that DNA testing was not conducted on the knife referred to in Dr. Peerwani's letter. Appellant contends

_____

[19]In his letter to Detective Ford, Dr. Peerwani described the knife as having "a tapering meta[l]lic blade and a wooden maroon dyed or discolored handle. The blade is single edged having a length of approximately 4 1/2 inches and a somewhat tapering thickness of approximately 1/8 inch."

20

that biological testing of the knife submitted to Dr. Peerwani *could* reveal some exculpatory evidence; however, "[a] literal reading of [article 64.01(a)] unequivocally mandates that all evidence to be tested must first be proven to contain biological material." *Swearingen v. State*, 303 S.W.3d 728, 732 (Tex. Crim. App. 2010). "[A] mere assertion or a general claim that existence of biological material is probable will fail to satisfy the appellant's burden." *Id.* Appellant does not establish that the attacker *would* have left biological material containing DNA on the knife. He also does not present expert testimony, scientific data, or trial records or testimony to support his conclusory statement. Moreover, the record does not indicate that biological material existed on the knife examined by Dr. Peerwani. A report from the medical examiner's forensic biology lab states that in 2001 presumptive tests for blood on a "buck knife" were negative.[20] Appellant fails to establish that biological material exists on the knife examined by Dr. Peerwani, and therefore he is not entitled to testing under chapter 64. *See id.* at 732–33 (defendant not entitled to DNA testing of ligature, even though evidence showed perpetrator touched it, because defendant made only a general claim that biological material could be found from the touching); *In re Nealy*, No. 03-09-00471-CR, 2010 WL 1730050, at *1–2 (Tex. App.—Austin Apr. 29, 2010, pet. dism'd) (mem. op., not designated for publication) (affirming order denying DNA testing of knife found at the scene, noting that evidence did

---

[20]It is not clear whether this is the same knife as the "kitchen knife" collected from the scene or the knife Dr. Peerwani examined.

21

not establish that knife inflicted wound or that person would have left biological material containing DNA).

Even assuming the knife Dr. Peerwani examined contained biological material, Appellant fails to satisfy article 64.01(b)(1). He does not assert that DNA testing was not available or that it was available but not technologically capable of providing probative results. Moreover, he does not demonstrate that through "no fault" of his own, testing was not conducted. As discussed above, his pretrial "testing" motion does not satisfy this provision. Further, his counsel could have reasonably determined that testing the knife Dr. Peerwani examined was not necessary and too risky. If DNA on the knife matched Appellant's, it would seal his guilt; if it did not, it would not exonerate him because the knife was not definitively identified as the one used in the killing. Thus, Appellant's counsel were not ineffective for not requesting DNA testing on the knife.

### c. Donahew's fingernail cuttings

In his DNA motion, Appellant asked the trial court to order DNA testing on Donahew's fingernail cuttings collected during the autopsy, asserting that it is "highly probable that [Donahew] might have scratched her assailant's skin and have his/her DNA embedded under the fingernails" and that this discovery could "by a preponderance of the evidence identify [Donahew's] assailant."

Serologist Susan Kenney testified that she worked for the Fort Worth crime lab in 1987, that fingernail cuttings were collected during Donahew's autopsy (and still exist), but that she found no record of any testing of or conclusions regarding the cuttings. Appellant fails to establish and the record does not

22

indicate, however, that Donahew's fingernail cuttings actually contain biological material. Indeed, Appellant's theory at trial (discussed further below) was that Donahew likely grabbed the hair of her assailant during the attack because her clenched fists contained hairs. While Dr. Peerwani testified that "the more probable way" that Donahew would have defended herself would have been to try to release her assailant's grip, this testimony does not establish that the cuttings contain biological material. *See Swearingen,* 303 S.W.3d at 733–34 (affirming the trial court's denial of DNA testing of the ligature used to strangle the victim because "no expert testimony or scientific data was presented to support the conclusion that DNA would necessarily be deposited through grasping with strong force"); *Routier*, 273 S.W.3d at 250 (rejecting defendant's speculative claim that a tube sock near crime scene could contain biological material in the form of saliva). Thus, Appellant fails to establish that biological material exists on the fingernail cuttings, and he therefore fails to satisfy chapter 64. *See Ex parte Gutierrez,* 337 S.W.3d at 900-01 (denying appellant's request to test fingernail scrapings of victim because there was no evidence to suggest she was able to hit or scratch her murderers with her fingernails). Because Appellant fails to establish that biological material exists on or in the fingernail cuttings, he is not entitled under chapter 64 to test the fingernail clippings.

Even assuming that the fingernail cuttings contain biological material, Appellant does not establish that he is entitled to testing. Appellant does not assert that DNA testing was not available or that it was available but not technologically capable of providing probative results. Moreover, Appellant's

23

counsel were not ineffective for not asking for that DNA testing. Counsel could have reasonably determined that any value in testing the clippings did not outweigh the risk. If DNA found in the clippings matched Appellant's, it would seal his guilt; if it did not, it would not exonerate him because there is no way to know whether it came from her killer. *See id.*

### d. Clenched Hairs

In his DNA motion, Appellant asserts that the Arlington police collected eleven hairs from Donahew's clenched fists, that four were tested, that one hair was apparently lost, and that the remaining six were not tested. He requests DNA testing on the six remaining hairs because "[t]here exists a reasonable probability that the last act [Donahew] might have done was grasp in her fists her assailant's head hair, knowing she was facing possible death." Our review of the record indicates that the only hairs not subjected to DNA testing were the ones microscopically determined to be Donahew's or her sister's and a "dust bunny" containing several hairs knotted together.

Dr. Peerwani testified that he collected hairs found in Donahew's clenched hands. Patricia Eddings, a senior trace analyst with the Tarrant County Medical Examiner's Crime Lab, testified that in August 2007 the district attorney's office asked her to microscopically examine hairs collected in this case. Eddings explained that she examined eleven slides that had been previously assembled to correspond to the hairs collected from Donahew's hands. According to Eddings, five of the slides, designated as 23J1–23J5, contained hairs from Donahew's right hand. Eddings testified that "[t]hose hairs all appeared to be

24

within the same range of microscopic characteristics" and that she believed that they came from the same individual. She further testified that six of the slides, designated as 23K1–23K4 and 23K6–23K7, contained hair from Donahew's left hand.[21] Eddings testified that slides 23K1–23K4 and 23K6 each contained one piece of hair but that slide 23K7 contained a "dust bunny," meaning it contained several hairs knotted together including animal hairs. Regarding slides 23K1–23K4 and 23K6, three of the hairs appeared to be consistent with Donahew's. Of the remaining two hairs, Eddings testified that one was "possible Caucasian origin, possible animal," noting that "[s]ome hairs are just not clearly defined" and explaining that "[t]his hair was just not microscopically — or did not bear the characteristics that would allow [her] to differentiate specifically between animal and human on that particular hair." The remaining hair was a medium-length human hair that appeared to be "blunt cut" as if cut with scissors, and it had a telogen root, meaning that it was ready to fall (and could have fallen) from the person's head.

Eddings testified that the purpose of her analysis was to identify (and send to another lab for further testing) a sample of hair from each of Donahew's hands that Eddings believed to be consistent with Donahew's hair and any hairs that did not appear to be consistent with Donahew's. Eddings sent four hairs to Dr. Amy

---

[21]Eddings noted that slide 23K5 was either missing or someone misnumbered the slides.

Smuts at the University of North Texas (UNT) for mitochondrial DNA testing.[22] Eddings testified about Dr. Smuts's results including that two of the hairs belonged to either Donahew or her sister;[23] one hair yielded no DNA, which is "very consistent" with it being animal hair; and the fourth hair was not consistent with Donahew's, her sister's, or Appellant's head hair.[24]

Thus, while the record supports Appellant's assertion that not all of the hairs were tested, our review of the record indicates that the hairs not subjected to mitochondrial DNA testing were the ones microscopically determined to be Donahew's or her sister's hair and the dust bunny. To be entitled to testing, Appellant must demonstrate that through "no fault" of his own, testing was not conducted. Here, Appellant's trial counsel were not ineffective for not asking that DNA testing be conducted on hairs microscopically determined to be Donahew's or her sister's (two of which were verified through mitochondrial DNA testing to be Donahew's or her sister's). As the evidence stood, his counsel were able to elicit from Dr. Peerwani that "there was not any hair in [Donahew's] hand or near her body or attached to her body by blood or anything else like that of

---

[22]Mitochondrial and nuclear DNA testing differ in that the root of the hair must be present to conduct nuclear DNA testing, while no root is required to conduct mitochondrial DNA testing.

[23]Eddings explained that mitochondrial DNA analysis follows the maternal lineage, therefore, if mitochondrial DNA analysis shows that hair may have come from Donahew, her sister cannot be eliminated as a source.

[24]Dr. Peerwani testified that "[o]bviously, hair fibers, other things could be easily transferred from the carpet onto a human body."

26

[Appellant]." Because Appellant fails to satisfy article 64.01(b)(1), he is not entitled to testing under chapter 64.

### e. Pubic Hairs

In his DNA motion, Appellant asserted that three foreign pubic hairs were collected from Donahew's pubic area and that one hair was identified as that of Ronald Nix. Appellant requests that DNA testing be conducted on the "remaining, untested hairs from [Donahew's] pubic hair combings."

Serologist Susan Kenney testified that in 1987 she examined three "questioned" loose pubic hairs combed from Donahew's pubic hair during her autopsy and that they did not appear (from a visual inspection) to be similar to Donahew's pubic hair.[25] When Appellant's trial counsel asked, whether "those pubic hairs from the combings would still remain available for any fancier science that we've got now," Kenney responded, "Yes. They may be mounted on slides."

A June 18, 2001 report from the medical examiner's DNA lab provides that it received "[t]hree slides FWPD '23F' pubic hair combings" but that no testing was conducted. Kenney testified that she spoke with trace analyst Dana Austin (with the medical examiner's lab) in July and August 2002 about the pubic hairs and that "there was some discussion whether or not that would be a suitable candidate to be sent off for mitochondrial, and I believe she was going to confer with Detective Ford to see if that was going to be a request."

---

[25]Kenney further explained that these hairs "could belong to someone else or they could just be the result that there's a variety of [Donahew's own] hairs. People's hairs don't all just look alike . . . ."

According to two reports, Orchid Cellmark conducted mitochondrial DNA testing in September 2002 and January 2003 on two of the slides, 23F-1 and 23F-3. The 2002 report indicates that the lab received (1) hair on slide 23F-1; (2) hair on slide 23F-3; (3) reference bloodstain, Linda Donahew; and (4) buccal swab, Michael Dealey. The 2003 report indicates that the lab received the same evidence received in 2002 but also the buccal swab of Ronald Nix. The reports conclude that mitochondrial DNA testing revealed that Donahew was included as being a possible contributor of the hair on slide 23F-3. The reports also concluded that Donahew and Michael Dealey were excluded as being possible contributors of the hair on slide 23F-1, but that Ronald Nix could not be excluded as being a contributor of the hair on slide 23F-1.[26] The reports also provide that the hair on slides 23F-1 and 23F-3 were "compared to a database of 4052 mtDNA sequences compiled by the FBI" and that no matching sequences were found.

The record indicates that two of the three pubic hairs were tested. We are unable to determine from the record whether the third slide (or corresponding hair) still exists. Testing cannot be required of evidence that does not exist. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(1)(A)(i); *Swearingen*, 303 S.W.3d at 732 ("Before a convicting court may order forensic DNA testing, it must be shown

---

[26]Detective Ford testified that he received information from Brian Sloan (with the private DNA lab Orchid Cellmark) in January 2003 that mitochondrial DNA testing of the pubic hairs revealed that Ronald Nix could not be eliminated as a contributor of one of the pubic hairs.

that the evidence 'still exists and is in a condition making DNA testing possible.'" (quoting *id*.)).

Even if the third pubic hair were found, however, Appellant fails to establish that it would be in a condition suitable for testing. The record suggests that 23F-2 was not sent to Orchid possibly because it was not a "suitable candidate to be sent off for mitochondrial [testing]."[27] Additionally, Appellant fails to satisfy the "no fault" provision. In this regard, Appellant's trial counsel were not ineffective for not pursuing the location or testing of the third slide or hair. In closing argument, defense counsel were able to argue that "we do know that a pubic hair consistent with Mr. Nix was mixed in with Ms. Donahew's pubic hair." Counsel further argued, "So if you believe Mr. Nix, that he hadn't seen her in over 72 hours but she bathes and showers and is a clean person, why is that pubic hair in her body at the time of her death? You see, because if Mr. Nix is not guilty, [Appellant] is not guilty." Counsel could have reasonably determined that testing the third hair would be risky because if the DNA matched Appellant, it would seal his guilt; if the DNA matched Nix or some other known or unknown individual, it would not necessarily exonerate Appellant because it could not be determined when the hair had been deposited.

---

[27]During opening argument, the prosecutor stated, "[W]e ran every single DNA test we could possibly think of on all of the evidence that was obtained in 1987 to see if we could find anything."

### f. Blood and Fingerprint Evidence

In his DNA motion, Appellant asserts that "[t]here was a blood transfer discovered on the hot water knob of the faucet in the masterbath." He also asserts that this blood transfer was not DNA tested, and he requests that DNA testing as well as a fingerprint search be ordered to "search for the individual who left their fingerprint on the water faucet in the masterbath." He contends that, if discovered, this evidence would be highly exculpatory. As the record demonstrates, Appellant merges two separate pieces of evidence collected from Donahew's bathroom: the partial latent fingerprint lifted from the hot water knob and the blood transfer identified on the water faucet.

At trial, Officer Brozgold identified a photograph depicting the faucet in Donahew's bathroom, and he testified that a "red substance transfer that we believed was blood . . . was somehow transferred onto the front facing of this faucet." The following dialogue then occurred,

> Q. [State]: Based on your training and experience, would that be indicative of someone with blood on their hands or some part of their body touching the head of that faucet?
>
> A. [Officer]: Yes. That would be a possibility.
>
> Q. Could the assailant have used that bathroom area to clean up, so to speak?
>
> A. That is possible.

Officer Brozgold further testified,

> Q. [Defense Counsel]: Let me show you now State's 32, and this looks like a faucet and appears to be some type of red substance. Did you take a sample of that to see if that was blood?

30

A. [Officer]: I took a sample of it. I didn't do any physical work with it at the scene to determine what it is.

. . . .

A. It would have been submitted to a crime lab . . . .

. . . .

Q. Now, historically, if someone — this happens a lot. If someone is a perpetrator and they get blood on them and they don't want to walk around with blood on them, they generally will go to a bathroom and wash off what they can; is that fair to say?

A. They could, yes.

Q. I mean, that happens all the time in homicide scenes. You've seen that, haven't you?

A. Yes, sir.

. . . .

Q. Did you check to see if there's any prints left on the faucet area?

A. I did.

. . . .

Q. On the faucet I was talking about, I asked you about the knobs and if you collected any prints. Do you have your report in front of you?

A. Yes.

Q. Did you collect a partial latent print off the hot water knob?

A. Yes, I did.

Q. But no identifiable print from the cold water knob?

A. Correct.

. . . .

31

Q. If you have a print that's taken from a crime scene but you have no print to compare it to, it doesn't do any good, does it?

A. We just have an unidentified print from a crime scene.

Q. I mean, it's worthless, basically. But if you have someone who is a suspect and they have some prints taken at the time of their arrest and you have the print lifted from the crime scene, someone who is a fingerprint analysis expert could go back and analyze the comparisons to see if they have the certain characteristic to match; is that true?

A. Yes, th[ey] could.

Officer Brozgold testified that he collected a sample of the red substance from the faucet and submitted it to the Tarrant County crime lab. Susan Kenney testified that in 1987 she received canisters containing a sample of the substance from the faucet and that presumptive testing indicated that it was likely or possibly blood. The record does not indicate that other testing was conducted on the sample.

Appellant's request for a fingerprint search for a match of the latent print lifted from the hot water knob is not compelled by chapter 64 because it does not involve the testing of biological material. *See Skinner v. State*, 122 S.W.3d 808, 812 n.4 (Tex. Crim. App. 2003) ("Chapter 64 deals with the testing of forensic DNA evidence. Fingerprint evidence is not covered."); *see also In re Morton*, 326 S.W.3d 634, 647 (Tex. App.—Austin 2010, no pet.) (explaining that the analysis of identifying characteristics inherent in fingerprints does not involve testing of biological material and therefore is not covered by chapter 64).

As to the presumptive blood on the faucet, Appellant does not argue that DNA testing was not available or available but not technologically capable of providing probative results at that time. Thus, we must determine whether testing was not conducted through no fault of Appellant; specifically, we must determine whether his trial counsel were ineffective for not requesting that DNA testing be conducted on the blood transfer. Significantly, the trial testimony revealed that there was a lot of blood at the crime scene, and witnesses described Donahew's body as being covered in smeared blood. The record does not indicate that the assailant left his own blood at the scene, and Appellant does not argue that the blood on the faucet belongs to the assailant. (In fact, Appellant's primary focus in his DNA motion is to search for "the individual who left their fingerprint on the water faucet in the masterbath.") A fingerprint was not lifted from the bloody faucet, and Appellant does not explain why his attorneys should have asked to test the blood (presumably Donahew's) for the presence of additional DNA evidence. *Cf. Routier*, 273 S.W.3d at 252 ("On the assumption that the palm print [embedded in dried blood on the coffee table] must therefore belong to the unknown intruder, the appellant argues that the blood should be tested for the presence of male DNA.") Thus, Appellant fails to establish that he is entitled to DNA testing of the presumptive blood collected from the water faucet in the master bath.

33

### 4. Previously Tested Biological Material

#### a. Oral Swabs

In his DNA motion, Appellant requests the testing of "the sticks used for the oral swabs." While Appellant acknowledges Constance Patton's testimony that the oral swabs she tested in 2005 consisted of only a few remaining fibers and that the available material was consumed, he argues that "there may still exist DNA on the sticks that could be used in further testing." The State argued in its response motion and on appeal that it is unlikely that newer testing of this evidence would provide results that would provide a more accurate or probative result than the results of the previous test or would exonerate Appellant.

Patton, a senior forensic biologist and DNA technical leader with the medical examiner's lab, testified that she worked on this case beginning in 1987. In 2001, she used a known bloodstain from Donahew to obtain her DNA profile. In 2005, Detective Ford asked her to conduct STR DNA testing on the oral swabs. She explained that, in conducting this testing, genetic material is extracted and a genetic profile is obtained and that

> what we do during that process is amplify different genetic markers on your chromosomes. And we basically develop a profile across 15 different genetic markers. And you think of it as 15 different points of comparison. And across these 15 genetic markers, we develop types, and it's just a matter of comparing the type at each genetic marker or genetic location back to a known individual's type to see if they could or could not be a possible contributor of that profile.

Patton explained that she cut off the tops of the oral swab sticks, put them in a tube, and performed the extraction process. She obtained two samples, a female and a male component. The profile developed from the female

34

component matched Donahew's DNA profile. Patton testified that she also developed a male profile, which she entered into the Texas Combined DNA Index System. Later, she was notified that this profile produced a "hit," that is, it matched Appellant's DNA profile; Appellant had previously submitted a DNA specimen in 2001 (while in prison on another offense), which had been uploaded onto CODIS. The State introduced a chart comparing the data obtained from the male component of the oral swab mixture and Appellant's known DNA profile, and it showed that Appellant's "alleles"—described as the characteristics specific to the person's DNA at a certain location on the DNA strand—could "be accounted for at all fifteen genetic markers" of the oral swab male component.[28]

---

[28]Patton also testified that there were "two additional minor alleles" that were detected in the oral swab mixture that did not come from Donahew or Appellant. The State articulated its position on this issue during closing argument as follows:

> We bring you everything, which is why we brought the alleles, the two minor alleles in her mouth, the 15 genetic markers that match [Appellant] and then you have two minor, minor, not even major, contributors, minor alleles. [In] 1987, we could not foresee what we know now. Otherwise, I submit to you the Fort Worth Crime Lab wouldn't have had volunteers putting sexual assault death kits together with their bare hands, taking swabs and putting them in envelopes and sealing them and passing them on to the Medical Examiner's Office. People like Susan Kenney, Susan Taylor then, come in and not wearing gloves and taking off samples to see what she could find.

Appellant's trial counsel argued that the DNA evidence "showed some results that were consistent with the DNA of [Appellant], and it showed some results that means that there was some other contributor, or donor, of DNA in Linda Donahew's mouth. . . . There were only two alleles and some loci, but [Appellant] was excluded as a contributor to one of the DNA samples. So either accept DNA all or none."

Patton testified that Appellant could not be excluded as the contributor of the male component of the oral swab mixture, and she calculated that at least 99.999% of the Caucasian, African-American and southwestern Hispanic populations could be excluded as a possible contributor to the mixture.

Regarding the condition of the swabs, Patton testified,

There were two swabs originally and they were swabs on wooden shafts with cotton fiber tips, and the cotton fiber material had essentially all been consumed back in '87 for conventional-type tests. So the only thing that was left were essentially two wooden sticks with a few pieces of fiber material on the end. So there was not much material at all remaining.

. . . .

From the oral specimen, what I essentially did was what was left of the two oral swabs or oral sticks, I went ahead and cut off those two ends of those sticks, put them in a tube and went through the extraction process.[29]

On cross-examination, Patton testified as follows:

A. [Patton]: When I first inventoried those contents in 2001, I opened it up and saw two sticks with a couple of fibers on the end. So I didn't proceed any further because I really didn't think there was a possibility of getting anything. And then in 2005, Detective Ford just made the request to go ahead and just consume whatever needed to be consumed and just attempt it. So it was an attempt.

. . . .

Q. [Defense Counsel]: But in the process of doing that, because the material available was so small, the oral swab that's essentially for any further DNA analysis had been consumed; is that true?

---

[29]In its DNA response motion, the State noted that three oral swabs were taken from Donahew's mouth during her autopsy. The record indicates that there were two oral swabs that were listed as "item number 3" by the medical examiner's DNA lab.

36

A.  That's correct.

Appellant's trial counsel stated in closing argument that "the DNA was consumed during the testing, and so I hope they got it right.  I hope they got the profile right when they did it because it's all gone.  We can't request that it be retested. There's nothing to retest."

Before a convicting court may order forensic DNA testing, it must be shown that the evidence "still exists and is in a condition making DNA testing possible."  *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(1)(A)(i); *Swearingen*, 303 S.W.3d at 732.  Because Appellant has not met this condition, he is not entitled to testing under chapter 64.[30]

### b.  DNA and Hair on Clothes

In his DNA motion, Appellant requested that "DNA testing be ordered on the male DNA discovered on [Donahew's] green shirt and bra that no determination was made prior to trial to who it belonged to."  Appellant alleges that the State argued it was possible that the assailant forcefully pulled Donahew's green shirt and bra because of the slight cut or tear to each garment and that, therefore, the discovered and unidentified male DNA could point to the assailant and prove his innocence.  He also requested that a hair collected from the green shirt be tested.

---

[30]"In the absence of bad faith, a failure to preserve potentially useful evidence does not violate due process."  *Swearingen*, 303 S.W.3d at 732.  Here, Appellant has not alleged, nor is there evidence of, bad faith on the part of the State.

Detective Ford testified that when crime-scene investigators moved a couch away from Donahew's bedroom wall, they found a pile of clothing, including a woman's green knit shirt that had been torn or cut in the center, a bra that had been torn or cut in the center, a skirt, and a pair of shoes.[31] Detective Ford testified that the bra and the shirt were tangled or rolled up in one another. A hair was collected from the shirt. When asked if he knew what had been done with the hair and whether it still existed inside the envelope designated "hair from shirt" found inside the same bag as the shirt, Detective Ford testified, "I don't know, sir. I do recall making requests to get all the hairs analyzed, and I think I was told there was some additional work done later on. I don't know anything about the results of that other than hearsay, what maybe somebody told me." He also stated that the envelope "is still sealed. It's been taped back shut so . . . ."

Biologist Constance Patton testified that in 2001 she swabbed and conducted STR DNA analysis on the green shirt and the bra. She obtained no "results at all" from the bra. She explained that the green shirt had "a slight tear in the center and the request was to swab that area in case somebody possibly, maybe, grabbed it and tore it and handled it in that area." Patton also testified at trial as follows:

> Q. [Defense counsel]: Okay. And you got a DNA profile from that swabbing in which you concluded Linda Donahew cannot be excluded as a possible contributor to what was a mixture?

---

[31]Donahew's friend Linda Reed testified that Donahew had come to her home the day of the offense and that she had been wearing the green shirt collected from the crime scene.

38

A. [Patton]:  Yes.

Q.  And then a small quantity of male DNA was detected.  However, no further conclusions could be made regarding the source of the male contributor.  Was that your finding?

A.  Yes.  There just wasn't enough information to make any conclusions regarding who the contributor could be.

Q.  Okay.  Well, from the small quantity of the male DNA that was detected, were there any allele calls found and just weren't 13 or 15, or none were found?

A.  It was a very partial profile.  And there just wasn't enough information to make any conclusion about who that—who the extra contributor or contributors could have been.

Q.  Was there an ability to exclude someone?  If there were some alleles, couldn't you exclude —

A.  It would be possible to exclude but probably not to include.

Q.  Okay.  Do you have the allele call that you got from the green shirt?

A.  I do.

The State's 64.02 notice regarding existing evidence states that the Tarrant County Medical Examiner's Biology/DNA Lab possesses:  "39T1/39T2 Swabs from green shirt (39T1 most of which consumed)" and "40T Swab from bra (most of which consumed)."

Based on our review of the record, we cannot say definitely whether the hair collected from the green shirt exists or whether it was previously tested.  If it was not previously tested, Appellant does not satisfy the article 64 requirements because he cannot show that testing was not conducted through no fault of his own.  While aware of this evidence, his attorneys cannot be considered

39

ineffective for choosing not to seek testing of the hair. If the hair's DNA were found to match Appellant's DNA, it would further implicate him in this crime. However, if his DNA were not found, it would not exonerate him. Trial testimony revealed that Donahew had been wearing the shirt for several hours before she was killed. Additionally, officials collected the shirt from the floor behind a couch. DNA testing would not prove how or when the hair came to be on the shirt. If the hair was previously tested, we have not located the results, and Appellant does not establish, as required, that "although previously subjected to DNA testing, [the evidence] can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." *See* Tex. Code Crim. Proc. Ann. art. 64.01(b)(2).

Regarding the bra, Appellant fails to establish that biological material still exists to be tested; indeed, documents indicate most of it was consumed. Even assuming biological material still exists, Appellant does not argue the DNA collected from the bra could be subjected to newer testing techniques that would provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test. *Id.*

Regarding the green shirt, the record suggests that a swab containing biological material exists, but we cannot say definitely. Assuming it does, Patton testified at the 2007 trial that, at most, the contributor could be excluded. If additional testing were warranted, Appellant should have asked for it at that time. His attorneys cannot be said to have been ineffective for not pursuing testing,

40

however. First, there was always the chance that he would not have been excluded. Second, it is not entirely clear that additional testing was needed to determine whether Appellant could be excluded. Indeed, Patton suggested that a person could be excluded as the contributor based on the alleles identified in the male DNA detected on the shirt. The defense already possessed Appellant's DNA profile, which listed his "alleles" for fifteen genetic markers (as discussed above regarding the oral swabs). Patton testified that she had the "allele call sheet" regarding the green shirt. In any event, when the State asked to see the sheet, Patton began looking for it, and the trial court excused the jury from the courtroom. Subsequently, the trial court stated on the record,

> Defense has had the opportunity to review their notes. They've had the opportunity to speak in private off the record with the witness, to speak in private off the record with their appointed DNA specialist, and they've just apprised the Court that based upon the pluses and minuses of any further examination of this witness, they've decided they have no further questions.

Thus, the record indicates that Appellant's trial counsel made a strategic decision not to inform the jury further on this issue.

Additionally, Appellant does not allege, and offers no evidence, that a newer testing technique exists or that any newer testing technique is reasonably likely to provide more accurate and probative results than the previous testing. *See Swearingen*, 303 S.W.3d at 735 ("[A]ppellant has not shown a reasonable likelihood that results [from a newer testing technique] would be more accurate or probative."); *Routier*, 273 S.W.3d at 250 (holding defendant not entitled to retest blood stains on socks because she failed to establish that newer testing results

41

would be more probative than results of previous testing).[32] *Cf. Routier*, 273 S.W.3d at 254–55 (holding that defendant met burden of showing reasonable likelihood of obtaining more accurate and probative results from retesting of certain blood stains and hair samples through expert affidavit establishing availability of newer STR testing technique and improved "clean up" technology). Notably, the State did not retest the evidence in 2005 or in the weeks leading up to the 2007 trial, even though the State continued to test evidence both times. Appellant fails to satisfy article 64 regarding the bra, green shirt, and the piece of hair collected from the green shirt.

### 5. Conclusion

For the above reasons, none of the items Appellant has identified in his DNA motion qualify for testing, and therefore, none are included in the "collective calculus" for determining whether he would not have been convicted if exculpatory results had been obtained through DNA testing. *See Routier*, 273 S.W.3d at 245; *see also Johnson v. State*, No. 14-08-00441-CR, 2009 WL 1493040, at *2 (Tex. App.—Houston [14th Dist.] May 28, 2009, pet. ref'd) (mem. op., not designated for publication) (holding that none of the items appellant identified qualified for testing under article 64.01, and therefore, none were

---

[32] *See Marks v. State*, No. 02-09-00144-CR, 2010 WL 598459, at *1 (Tex. App.—Fort Worth Feb. 18, 2010, no pet.) (mem. op., not designated for publication) (holding that appellant failed to "allege, much less prove, that [the requested testing facility] will utilize 'newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test'" and therefore did not meet the requirements of article 64.01(b)(2)) (quoting *Routier*, 273 S.W.3d at 250).

included in the "collective calculus" for determining whether he would not have been convicted). For all of the above reasons, the trial court did not err in denying Appellant's motion for post-conviction DNA testing. We overrule Appellant's first issue.

## C. Trial Court Findings

In his third issue, Appellant complains of the trial court's order denying DNA testing, asserting that the trial court erred by not making "proper findings." The order provided that Appellant "failed to meet the article 64 requirements for forensic DNA testing" in that he

> has failed to show that there exists a reasonable probability that the DNA testing would prove his innocence because it is extremely unlikely that any new DNA re-testing technique would provide a more accurate or probative result. [Appellant] has also failed to show that there exists a reasonable probability that further DNA testing would prove his innocence because of the Texas Department of Public Safety's Combined DNA Index System ("CODIS") discovery that [Appellant's] DNA is a positive match with semen found in the mouth of the Deceased at the time of her murder. When this CODIS match was identified, a subsequent DNA sample was taken from the Defendant and re-tested. Again, the [Appellant's] DNA was a 99.99% positive match to semen found in the Deceased's mouth.

Appellant asserts that the trial court's findings were "not germane nor did they reference the relevant statutory portion of Article 64 that appellant relied on in his request for DNA testing." He explains that,

> The trial court issued this memorandum and order in apparent allusion to Art. 64.01(b)(2) . . . pertaining to the DNA testing of material that was "previously subjected to DNA testing." . . . However, the sum of appellant's Art. 64 requests relied upon Art. 64.01(b)(1) which authorizes trial courts to order new DNA testing of material that "was not previously subjected to DNA testing."

43

He complains that "it is ambiguous" why the trial court ultimately denied his article 64 request.

As the State advises, a trial court is not statutorily required under article 64 to issue specific findings of fact demonstrating its reasons for denying a request for post-conviction DNA testing. *See Dixon v. State*, 242 S.W.3d 929, 933 (Tex. App.—Dallas 2008, no pet.). While the court of criminal appeals stated in *Skinner* that "the trial court should provide determinations under [article 64]," it held that the trial court's findings in its case—that appellant failed to meet the standards required by 64.03(a)(2)(A) and 64.03(a)(2)(B)—were sufficient for its review, noting that these two provisions were application-of-law-to-fact questions and therefore given de novo review. *Skinner*, 122 S.W.3d at 813. The *Skinner* court noted, however, that "this Court would appreciate more detailed findings from the trial court to facilitate our review." *Id.*

In conducting our de novo review, we assessed whether the trial court's ruling denying DNA testing is supported by the record. *See Smith*, 165 S.W.3d at 363; *Sheckells*, 2011 WL 1367087, at *2. Because we did not defer to the trial court's findings and because we have concluded that the trial court's denial of testing is supported by the record, we do not address whether the trial court's findings were sufficient. *See State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000) (holding that if the trial court's decision is correct on any theory of the law applicable to the case, its decision will be sustained).

To the extent the *Skinner* opinion suggests that we need to do so, we address whether the trial court provided "determinations under the statute." 122

44

S.W.3d at 813. The parties appear to agree that the trial court denied testing under articles 64.01(b)(2) and 64.03(a)(2)(A). Appellant asserts that the trial court failed to address his article 64.01(b)(1) contentions regarding evidence that was not previously subjected to DNA testing. *See* Act of April 5, 2001, 77th Leg., R.S., ch. 2, § 2, 2001 Tex. Gen. Laws 2, 2–3 (amended 2011). While the trial court does not directly address article 64.01(b)(1), its order states that Appellant "failed to meet the requirements of article 64 of the Code of Criminal Procedure," that it is extremely unlikely that any new DNA re-testing technique would provide a more accurate or probative result, and that "further testing" would not prove his innocence. Orders similar to the one issued by the trial court in this case have been deemed sufficient to apprise the reviewing court of the trial court's reasons for denying DNA testing. *See Skinner*, 122 S.W.3d at 813 (holding sufficient trial court's finding that appellant failed to meet the requirements of 64.03(a)(2)(A) and 64.03(a)(2)(B)); *Smith v. State*, No. 12-09-00069-CR, 2009 WL 3371547, at *2 (Tex. App.—Tyler Oct. 21, 2009, no pet.) (mem. op., not designated for publication) (holding sufficient trial court's order, which stated that it had reviewed the file and a letter from DNA counsel and that it "fails to find any grounds for further testing"); *Darnell v. State*, No. 02-03-00173-CR, 2004 WL 1088755, at *3 (Tex. App.—Fort Worth May 13, 2004, pet. ref'd) (mem. op., not designated for publication) (holding sufficient order stating that appellant "failed to meet the requirements of article 64.03").

Even assuming the findings were insufficient, we do not remand this proceeding to the trial court for additional findings (as Appellant requests)

45

because we have addressed all of his concerns in our de novo review set out above. *Cf. Routier*, 273 S.W.3d at 249 ("Because the convicting court misconstrued or failed to apply the proper criteria for obtaining post-conviction DNA testing under Article 64.01(b), we will review the question whether the appellant has met those particular criteria *de novo*, notwithstanding the convicting court's fact finding."). Having addressed all of Appellant's concerns, we conclude that he has not been harmed by any alleged insufficiency in the trial court's findings. *See generally Swearingen*, 303 S.W.3d at 738–39 (assessing harm in the context of chapter 64); *Garcia v. State*, 327 S.W.3d 269, 271 (Tex. App.—San Antonio 2010, pet. ref'd); *Sepeda v. State*, 301 S.W.3d 372, 375 (Tex. App.—Amarillo 2009, pet. ref'd). We therefore overrule Appellant's third issue.

## V. Conclusion

Having overruled Appellant's three issues, we affirm the trial court's order denying Appellant's motion for DNA testing.

ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 8, 2012